IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE

FILED

FOR PUBLICATION
July 6, 1999
FILED:  July 6, 1999
Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | DAVIDSON CRIMINAL |
| | ) | |
| Appellee, | ) | |
| | ) | |
| | ) | |
| Vs. | ) | HON. ANN LACY JOHNS, |
| | ) | JUDGE |
| | ) | |
| DONALD RAY MIDDLEBROOKS, | ) | |
| | ) | |
| Appellant. | ) | NO. 01S01-9802-CR-00017 |

**For Appellant:**
Lionel R. Barrett, Jr.
Nashville, Tennessee

Richard McGee
Nashville, Tennessee

**For Appellee:**
John Knox Walkup
Attorney General & Reporter

Michael E. Moore
Solicitor General

Kathy Morante
Deputy Attorney General
Nashville, Tennessee

**At Trial:**
Victor S. Johnson III
District Attorney General

Roger D. Moore
Assistant District Attorney General

John C. Zimmerman
Assistant District Attorney General
Nashville, Tennessee

# O P I N I O N

AFFIRMED                                                    ANDERSON, C.J.

This case is before us for automatic review of the Court of Criminal Appeals' affirmance of a death sentence imposed upon Donald Ray Middlebrooks in a Davidson County resentencing hearing for first degree murder.[1]

Middlebrooks initially was convicted of felony murder and sentenced to death based on the jury's finding that evidence of two aggravating circumstances -- that the murder was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," Tenn. Code Ann. § 39-2-203(i)(5) (1982) (now codified in Tenn. Code Ann. § 39-13-204(i)(5) (1997 & Supp. 1998)), and that the victim was killed in the commission of a felony, Tenn. Code Ann. § 39-2-203(i)(7) (1982) (now codified in Tenn. Code Ann. § 39-13-204 (i)(7) (1997 & Supp. 1998)) -- outweighed evidence of mitigating circumstances.

On appeal, this Court affirmed Middlebrooks' conviction but remanded the case for resentencing because the (i)(7) felony murder aggravating circumstance used to impose the death sentence duplicated the offense of felony murder and therefore failed to narrow the class of death-eligible defendants under Article I, Section 16 of the Tennessee Constitution. State v. Middlebrooks, 840 S.W.2d 317 (Tenn. 1992), cert. dismissed, 510 U.S. 124, 114 S. Ct. 651, 126 L. Ed. 2d 555 (1993).[2]

At the resentencing hearing, the jury again sentenced Middlebrooks to death based on the aggravating circumstance that "the murder was especially heinous,

---

[1]    "Whenever the death penalty is imposed for first degree murder and when the judgment has become final in the trial court, the defendant shall have the right of direct appeal from the trial court to the court of criminal appeals. The affirmance of the conviction and the sentence of death shall be automatically reviewed by the Tennessee supreme court. Upon the affirmance by the court of criminal appeals, the clerk shall docket the case in the supreme court and the case shall proceed in accordance with the Tennessee Rules of Appellate Procedure." Tenn. Code Ann. § 39-13-206(a)(1) (1997).

[2]    Justice Drowota and former Justice O'Brien dissented as to this holding in Middlebrooks. 840 S.W.2d at 347-50 (Drowota, J., dissenting).

atrocious, or cruel in that it involved torture or depravity of mind." Tenn. Code Ann. § 39-2-203(i)(5). The Court of Criminal Appeals affirmed Middlebrooks' sentence. After the case was docketed as a death penalty appeal in this Court, we entered an order specifying three issues for oral argument: (1) whether Tenn. Code Ann. § 39-2-203(i)(5), the aggravating circumstance applied in this case, was constitutional; (2) whether the prosecutor's closing argument violated Middlebrooks' right to due process; and (3) whether the sentence of death is disproportionate.[3]

After reviewing the record, the Court of Criminal Appeals' decision, the issues raised, and the applicable law, we have determined beyond a reasonable doubt that none of the alleged errors affected the sentence imposed by the jury; moreover, the evidence supports the jury's sentence of death, and the sentence is not disproportionate or arbitrary as applied to the defendant. We have also determined that the aggravating circumstance, Tenn. Code Ann. § 39-2-203(i)(5), was constitutionally applied in this case. Accordingly, we affirm the sentence of death by electrocution.

## FACTUAL BACKGROUND

We begin by reviewing the evidence introduced at the resentencing hearing. On the day of the murder, April 26, 1987, Donald Ray Middlebrooks, a twenty-four-year-old white male, his wife, Tammy Middlebrooks, a seventeen-year-old white female, and their friend Roger Brewington, a sixteen-year-old white male, had set up a make-shift flea market in East Nashville. When Kerrick Majors, the fourteen-year-old black male victim, and four of his friends walked over and began looking at the items on the table, Tammy Middlebrooks yelled "Hey, ya'll niggers leave our stuff alone."

---

[3] "Prior to the setting of oral argument, the Court shall review the record and briefs and consider all errors assigned. The Court may enter an order designating those issues it wishes addressed at oral argument." Tenn. Sup. Ct. R. 12.

Donald Middlebrooks and Brewington chased after Majors and the other boys. Shannon Stewart testified that as he fled from the scene, he saw Brewington grab Majors and drag him toward the table, where Middlebrooks struck Majors in the face and knocked him down. Stewart heard Middlebrooks order Majors to "shut up nigger." The boys who made it to safety told Majors' mother what had happened. Majors' mother called the police and also searched for her son. The next day Majors' naked body was found lying face up in a dry creek bed under a foam mattress in the woods near the area where Majors had been abducted.

Bruises, scrapes, abrasions, and burns covered Major's body. A woven belt was strapped around his left wrist. A large laceration was sliced across his right wrist. Two large lacerations made by a sharp instrument formed an "X" across his chest. A bloody and swollen gash was above his left eye. His nose was bloody, red, badly burned, and had pieces of skin missing. His lips were swollen and lacerated, and the inside of his mouth was bloody and lacerated. His testicles were badly swollen, and his legs were covered in blood down to his feet. There was urine on different parts of his body and on a rag tied in a tight knot around his neck that had been used as a gag in his mouth. A bloody stick lay next to his head. Finally, there were two deep stab wounds in his chest a couple of inches apart.

The autopsy indicated that the cause of death was a stab wound to the chest and that the murder weapon had been plunged to a depth of 3.3 inches. The "X" carved into Majors' chest was inflicted before the stab wounds, and at least one of the stab wounds was made prior to his death. Majors was alive and conscious throughout the infliction of the injuries and wounds. Majors lived a minimum of five to six minutes and a maximum of thirty minutes from the time of the stab wounds. He also would have been conscious part of the time while bleeding to death after being stabbed.

Two days after the murder, Brewington voluntarily notified the police that Donald Middlebrooks and Tammy Middlebrooks were involved in the murder. He showed the officers a bloodstained knife with a brass knuckle handle that had been used on Majors. Brewington also told the officers where to find Middlebrooks and his wife.[4]

After being arrested, Middlebrooks gave a video-taped confession to the police in which he admitted his own involvement but described Brewington as the leader. According to Middlebrooks, after dragging Majors into the woods, Brewington tied Majors' hands and then slapped him, beat him with brass knuckles, urinated in his mouth, and made him swallow. Middlebrooks said that Brewington also beat Majors' testicles, threatened to cut "it" open, beat his mouth and tongue with a stick, and stuck a stick in Majors' anus. Whenever Majors resisted or screamed, Brewington continued to beat and slap him. Brewington told Majors he was taking him "back to the days of Roots." Brewington "dropped" the knife repeatedly on top of Majors, gagged him, and slashed his wrist. Middlebrooks stated that Tammy Middlebrooks also slapped Majors and burned his nose with a cigarette lighter.

Middlebrooks said that Majors was crying and begging them to stop. When Majors pleaded that all he wanted to do was to "go to school and get an education," Brewington replied "F--- you, nigger." Middlebrooks also said that Majors' cries were getting on his nerves so he asked Brewington to stop. According to Middlebrooks, Brewington then kissed Majors on the forehead and told him that it was "the kiss of death."

---

[4]     All three were charged with Majors' murder. Brewington was eventually tried as an adult and convicted of first degree murder, aggravated kidnapping, and armed robbery and sentenced to consecutive sentences of life, 40 years, and 35 years, respectively. Because he was a minor, he was not eligible for the death penalty. See State v. Brewington, No. 89-232-III, 1990 WL 83406 (Tenn. Crim. App. June 20, 1990), perm. app. denied, (Tenn. Oct. 1, 1990). Tammy Middlebrooks pled guilty to first degree murder and was sentenced to life imprisonment.

In the video-taped confession, Middlebrooks admitted stabbing Majors once and striking him across his legs with a switch. Middlebrooks explained that both he and Brewington stabbed Majors once. In a prior statement, however, Middlebrooks claimed to have inflicted both stab wounds. He also claimed he did not stop the torture because he was afraid of Brewington and is "scared to fight." At another point, Middlebrooks contended that he stabbed Majors to prove he was "cooler" than Brewington.

According to the State's proof, fourteen-year-old Majors was small for his age.[5] He was described as a good student who loved school. He was not a violent person, nor did he carry a weapon. Since his murder, his mother's health has deteriorated. She has been on medication and will not leave the house except for doctor appointments. She has had a nervous breakdown, suffers from panic attacks, and has not been able to sleep at night since the murder. Majors' older brother blames himself for Majors' death and now suffers from mood swings.

Shannon Stewart testified that he had spoken with Middlebrooks the morning of the murder. Middlebrooks had told Stewart that he was a member of the KKK, that he "hated niggers," and that he punched a black man just for saying hello. Stewart also testified that he overheard Middlebrooks order Majors to "shut up nigger."

The defense introduced mitigation evidence as follows: Middlebrooks' cousins, James and Carol Sue Little, and his half-sister, Sharon Fuchs, testified about Middlebrooks' childhood. Middlebrooks grew up in Texas. His father died when he was four. His mother remarried and had another child, Ms. Fuchs, before she again divorced. Middlebrooks' mother either left the children at night with relatives or else would take them to bars with her.

---

[5] The autopsy indicated that Kerrick Majors was 4' 11" tall and weighed 112 pounds.

According to the proof, Middlebrooks' mother would often bring men to the house, and the children sometimes heard or saw their mother having sex. Ms. Fuchs testified that sometimes these men would molest her while her mother watched. She further testified that she, Middlebrooks, and other children in the family were molested by different family members. For example, Middlebrooks was often left alone with a male relative who had sexually abused him, and Middlebrooks' mother would grab him between his legs and also watch him use the bathroom. According to Sharon Fuchs, the small town in which they grew up lacked counseling services or social service agencies where they could seek help for sexual abuse. According to her, no one in the family ever discussed or admitted the family's problems.

The proof further indicated that Middlebrooks was often angry and got into trouble. He was sent to a Methodist Home for Children in Waco for two years. Later, he was twice sent to prison. Between prison stays, Middlebrooks started to have seizures. On one occasion he climbed a water tower and threatened to commit suicide. He was hospitalized more than once at a mental institution.

A psychologist, Dr. Jeffrey L. Smalldon, performed neuropsychological and psychological evaluations of Middlebrooks. From these evaluations, interviews, testing, and prior education and medical records, Smalldon concluded that Middlebrooks has a severe borderline personality disorder. Middlebrooks exhibited several characteristics of the disorder including inconsistent behavior, instability of mood, a marked identity disturbance, impulsive and reckless behavior, poor anger control, and recurring suicidal or self-destructive acts. Smalldon testified that the documents from other mental health professionals who have evaluated Middlebrooks indicate that he suffers from substance abuse, psychotic personality disorder, and schizophrenia. Middlebrooks also suffers a mild degree of organic brain impairment which causes him to be more impulsive and less able to delay his

responses. Finally, Smalldon testified that Middlebrooks has also exhibited characteristics of adults who were sexually abused as children.

During cross-examination, Dr. Smalldon admitted that Middlebrooks confessed to a greater involvement in Majors' death than he had in the video-taped confession. For instance, Smalldon disclosed that Middlebrooks admitted to him that it was his idea to hold Majors for ransom, that he helped tie Majors up, and that he urinated on Majors. In an attempt to resolve the discrepancies between the video-taped confession to the police and the confession made to him in the interview, Smalldon explained that Middlebrooks is a chronic liar. Dr. Smalldon conceded that Middlebrooks had never expressed any remorse to him. Smalldon agreed that there were some indications in the medical records of Middlebrooks' malingering, but testified that these indications were not inconsistent with mental illness.

In rebuttal, the State introduced the testimony of two experts indicating that Middlebrooks was exaggerating his mental illness symptoms, that he was competent to stand trial, that he did not have a defense of insanity, and that he was not committable. One expert testified that he could not say whether Middlebrooks was mentally ill. The other expert testified that he made no finding of mental illness and did not consider a personality disorder to be a mental illness.

After considering the evidence, the jury concluded that the aggravating factor set forth in Tenn. Code Ann. § 39-2-203(i)(5), that the murder was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," outweighed the evidence of mitigating factors. Accordingly, the jury sentenced Middlebrooks to death for the murder of Kerrick Majors.

## CONSTITUTIONALITY OF PRE-1989 VERSION OF (i)(5)

The first issue designated for oral argument is constitutional. Middlebrooks argues that the aggravating circumstance set forth in Tenn. Code Ann. § 39-2-203(i)(5) (1982) -- that the murder was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind" -- is unconstitutionally vague and that its application to this case violates Article I, Section 16 of the Tennessee Constitution and the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[6]

At the sentencing hearing, the trial court instructed the jury that "no death penalty shall be imposed unless you unanimously find that the State has proven beyond a reasonable doubt that the murder was especially heinous, atrocious, or cruel in that it involved torture or depravity of mind." It further instructed, however, that the jury was to follow these definitions:

> Heinous means grossly wicked or reprehensible, abominable, odious, vile.
>
> Atrocious means extremely evil or cruel, monstrous, exceptionally bad, abominable.
>
> Cruel means disposed to inflict pain or suffering, causing suffering, painful.
>
> Torture means the infliction of severe physical or mental pain upon the victim while he remains alive and conscious.
>
> Depravity means moral corruption, wicked or perverse act.

We begin with the principle that any aggravating circumstance must furnish a principled guidance for the jury to choose between death and a lesser sentence. E.g., Godfrey v. Georgia, 446 U.S. 420, 100 S. Ct. 1759, 64 L. Ed. 2d 398 (1980). In applying this principle, we have consistently upheld the constitutionality of Tenn.

---

[6] The trial court properly instructed under this pre-1989 version of (i)(5), which was in effect at the time of the offense. State v. Cazes, 875 S.W.2d 253 (Tenn. 1994), cert. denied, 513 U.S. 1086, 115 S. Ct. 743, 130 L. Ed. 2d 644 (1995). Effective in 1989, the aggravating circumstance was amended to replace "depravity of mind" with "serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (1997 & Supp. 1998).

Code Ann. § 39-2-203(i)(5) (1982) and have rejected the contention that it is vague or overbroad. State v. Blanton, 975 S.W.2d 269, 280 (Tenn. 1998); State v. Black, 815 S.W.2d 166, 181 (Tenn. 1991); State v. Barber, 753 S.W.2d 659, 670 (Tenn. 1988). Moreover, in State v. Williams, 690 S.W.2d 517 (Tenn. 1985), we carefully reviewed this aggravating circumstance and clarified its application by specifically defining each term and qualifier contained in (i)(5). These Williams' definitions were included in the trial court's charge to the jury in this case. We therefore reject Middlebrooks' claim that the aggravating circumstance was vague or overbroad.

Notwithstanding this Court's precedent, Middlebrooks relies on several United States Supreme Court decisions. See Shell v. Mississippi, 498 U.S. 1, 111 S. Ct. 313 112 L. Ed. 2d 1 (1990); Walton v. Arizona, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990); Maynard v. Cartwright, 486 U.S. 356, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988); Godfrey, 446 U.S. 420, 100 S. Ct. 1759. In State v. Thompson, 768 S.W.2d 239, 252 (Tenn. 1989), we distinguished the language of the aggravating circumstance in (i)(5) from the language condemned as unconstitutionally vague in Godfrey and Maynard by pointing out that the "especially heinous, atrocious, or cruel" language in Tennessee's statute does not stand alone but is modified and limited by the phrase "in that it involved torture or depravity of mind." Id. at 252; see also State v. Van Tran, 864 S.W.2d 465, 479 (Tenn. 1993) (heinous, atrocious, or cruel defined and limited by "torture or depravity of mind"). This requirement satisfies the constitutional mandate of narrowing and both limits and guides the sentencer in choosing whether to impose a sentence of death.[7]

---

[7] Middlebrooks also cites recent federal habeas corpus decisions addressing the (i)(5) circumstance. See Houston v. Dutton, 50 F.3d 381 (6th Cir. 1995); Rickman v. Dutton, 854 F. Supp. 1305 (M.D. Tenn. 1994); see also Coe v. Bell, 161 F.3d 320 (6th Cir. 1998). Houston and Rickman are distinguishable from Middlebrooks in that the trial court in those cases either failed to define the terms or provided only incomplete definitions of the terms used in the (i)(5) circumstance. In addition, the persuasiveness of Houston is weakened by the State's concession that the instruction was erroneous in that case. See Houston 50 F.3d at 387. More importantly, however, this Court is not bound by the decisions of the federal district and circuit courts but only by the decisions of the United States Supreme Court. E.g., State v. McKay, 680 S.W.2d 447, 450 (Tenn. 1984). The constitutionality of this aggravating circumstance has been challenged in the United States Supreme Court in the past; yet that Court has never granted review and held this circumstance unconstitutional. While we recognize that denial of certiorari by the United States Supreme Court is not a ruling on the merits, see, e.g., Teague v. Lane, 489 U.S. 288, 296, 109 S. Ct. 1060, 1067, 103 L. Ed. 2d 334

Furthermore, the proof in this case as previously summarized is sufficient to establish both torture and depravity of mind as defined by prior decisions of this Court.

## PROSECUTORIAL MISCONDUCT

The second issue designated for oral argument concerns prosecutorial misconduct. Middlebrooks contends that the prosecutor engaged in misconduct during his closing argument in three separate and distinct ways: first by emphasizing the victim's family's desire that the death penalty be returned; second by introducing and arguing racial issues; and finally, by making extensive references to the Bible and scripture. Middlebrooks argues that the misconduct violated his right to due process and led to arbitrary and unreliable sentencing in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article I, Sections 8 and 16 of the Tennessee Constitution. The State maintains that the argument was not improper and that, even if deemed to be improper, was not reversible error.

In general, closing argument is subject to the trial court's discretion. Counsel for both the prosecution and the defense should be permitted wide latitude in arguing their cases to the jury. State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). Argument must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law. E.g., State v. Keen, 926 S.W.2d 727, 736 (Tenn. 1994).

We will review Middlebrooks' contentions with these standards in mind.

### Victim's Family

_____

(1989), we nonetheless adhere to this Court's prior decisions upholding the constitutionality of this aggravating circumstance until the United States Supreme Court determines that this circumstance is unconstitutional.

With respect to the wishes of Kerrick Major's family,[8] the prosecutor made the following arguments:

> We are not asking you to kill anybody. Each one of you said you follow the law, and if the punishment, under the law, should be death, you swore that you could impose that verdict. That is your oath.
>
> Kerrick Majors lays in his grave, six feet under, but the last memory of looking up and seeing this defendant thrust his knife into him twice, he cries out for justice.
>
> His family asks you to impose the death penalty. The State asks you to impose the death penalty. The facts support it. He deserves it. Justice demands it on the facts and the law.

In State v. Nesbit, 978 S.W.2d 872 (Tenn. 1998), we held that evidence and argument regarding the impact of a crime on the victim's family are not per se improper or inadmissible under Tennessee statutory or constitutional law: "the impact of the crime on the victim's immediate family is one of those myriad factors encompassed within the statutory language 'nature and circumstances of the crime.'" Id. at 890 (quoting Tenn. Code Ann. § 39-13-204(c) (1997 & Supp. 1998)). Nor is such evidence or argument barred by the Eighth Amendment to the United States Constitution. Payne v. Tennessee, 501 U.S. 808, 825, 111 S. Ct. 2597, 2608, 115 L. Ed. 2d 720 (1991).

Victim impact evidence and argument, however, must be relevant to the specific harm to the victim's family. It must be limited to "information designed to show those unique characteristics which provide a brief glimpse into the life of the individual who has been killed, the contemporaneous and prospective circumstances surrounding the individual's death, and how those circumstances financially, emotionally, psychologically or physically impacted upon members of the victim's family." Nesbit, 978 S.W.2d at 891 (footnote omitted); State v. Burns, 979 S.W.2d 276, 282 (Tenn. 1998). Moreover, we specifically noted that "admission of

---

[8] The State argues that the issue should be treated as waived for defense counsel's failure to object at trial or to raise the issue in the motion for new trial. We have elected to review the issue on its merits.

a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment." Nesbit, 978 S.W.2d at 888 n.8 (citing Payne, 501 U.S. 808, 111 S. Ct. 2597 and Booth v. Maryland, 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 440 (1987)).

Applying these principles indicates that the prosecutor's statement, "[h]is family asks you to impose the death penalty" was improper.[9] Although evidence to this effect was not introduced during the sentencing hearing, and would have been inadmissible, the prosecutor's statement clearly is an improper characterization of the family's view as to the appropriate sentence.

### Race

Middlebrooks argues that the prosecutor engaged in misconduct by introducing evidence of his racial animus toward African-Americans and later arguing that race was a factor in the killing. He contends that Shannon Stewart's testimony that Middlebrooks told him he was a member of the KKK, hated blacks, and used the "N" word, as well as the evidence of racial epithets used by Middlebrooks and Brewington before and during the killing, were not relevant to the statutory aggravating circumstance and were prejudicial to his defense. He further contends that the prosecutor erred by making reference to this evidence during closing argument.

The State argues, and the Court of Criminal Appeals agreed, that the evidence and argument were relevant to the facts and circumstances of the offense and were proper rebuttal of Middlebrooks' theory that Brewington was primarily responsible for the crime and rebuttal of Middlebrooks' mitigating evidence. We

---

[9] As a related issue, Middlebrooks argues that the statement, "[t]he State asks you to impose the death penalty," was also improper. We disagree that this statement by itself constituted a statement of the prosecutor's personal opinion or was in any manner improper.

reached a similar conclusion in addressing the issue in Middlebrooks' initial appeal to this Court:

> The testimony is clearly relevant to show premeditation and a motive for the victim's brutal slaying. The testimony is also relevant to contradict the defendant's statement that Roger Brewington was the leader in the commission of the offense. In addition, given the relevancy of these statements, we find that the prejudicial effect did not substantially outweigh their probative value.

Middlebrooks, 840 S.W.2d at 330.

We again conclude that the testimony of Middlebrooks' racial animus toward African-Americans and his use of racial epithets toward Kerrick Majors before and also during the offense was properly deemed relevant and admissible to rebut the theory of defense and the mitigating evidence. The prosecutor, therefore, did not engage in any misconduct by using and arguing this evidence.

### Biblical References

Finally, Middlebrooks contends that the prosecutor improperly made references to the Bible during closing argument.

> [Defense counsel] has asked you to consider something else. He has asked you to consider the book where the words of our Lord are written, vengeance is mine.
>
> This lady [victim's mother] has come to this courtroom, not for vengeance, but to turn this over to you, the law. If she was after vengeance, this case would have never made it here.
>
> The same book that says vengeance is mine says whoever sheddeth man's blood, whoever sheddeth man's blood, then by man shall his blood be shed. The Lord meant for the system of laws and justice to govern societies wherever they are, and you are the tool of the Lord, that part of justice -- [objection by defense counsel].

When defense counsel objected, the State responded, and maintains on appeal, that its argument was a fair response to the following inappropriate statement made in closing by defense counsel:

> We do not apologize for asking for mercy, asking for leniency or sympathy. . . . Our life is given by our creator, and it is not to be taken lightly by man or our government using the guise of due process and

the judicial system as a thinly veiled guise for vengeance; vengeance, which I think our creator says is his and not ours.

We have condemned Biblical and scriptural references in a prosecutor's closing argument so frequently that it is difficult not to conclude that the remarks in this case were made either with blatant disregard for our decisons or a level of astonishing ignorance of the state of the law in this regard. State v. Cribbs, 967 S.W.2d 773, 783-84 (Tenn. 1998); State v. Cauthern, 967 S.W.2d 726, 737 (Tenn. 1998); State v. Stephenson, 878 S.W.2d 530, 541 (Tenn. 1994); State v. Bates, 804 S.W.2d 868, 881 (Tenn.), cert. denied, 502 U.S. 841, 112 S. Ct. 131, 116 L. Ed. 2d 98 (1991). As we said in Cribbs, "[i]n the face of this clear and longstanding precedent, the repeated introduction by prosecutors of such references into trials of serious criminal offenses is inexplicable." Id. at 784.

The obvious danger in such references by both prosecutors and defense counsel is the risk that a sentencing decision may be made not upon the facts and the law but on an appeal to the bias or passion of the jury. The prosecutor met an improper Biblical reference with a similarly improper Biblical reference that did not merely respond to defense counsel's argument. The prosecutor went beyond what could conceivably be deemed a fair response in literally equating the jury with "the tool of the Lord." As we have reiterated time and time again, the prosecutor has a legal and ethical duty to refrain from this sort of misconduct. Thus, we agree with Middlebrooks that the prosecutor's argument was improper.

**Effect of the Errors**

Where argument is found to be improper the established test for determining whether there is reversible error that requires resentencing is whether the improper conduct "affected the verdict to the prejudice of the defendant." Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965); Bigbee, 885 S.W.2d at 809. In making this determination, we must consider: 1) the conduct complained of, viewed in light of

-15-

the facts and circumstances of the case; 2) the curative measures undertaken by the court and the prosecution; 3) the intent of the prosecutor in making the improper arguments; 4) the cumulative effect of the improper conduct and any other errors in the record; and 5) the relative strength and weakness of the case. Bigbee, 885 S.W.2d at 809.

The first three factors weigh in favor of Middlebrooks' argument. The prosecutor made one improper argument that indicated it was the wish of the victim's family that a death sentence be returned. The statement about the family's wishes was brief and isolated, albeit improper. The defense did not object to and the trial court did not take any curative action. The prosecutor made a second improper argument paraphrasing scripture and equating the jury as the "tool of the Lord." The "tool of the Lord" remark triggered an objection from defense counsel. Despite the serious error and the defendant's objection, the trial court took no curative action. At the very least, the trial court should have instructed the jury to disregard the prosecutor's argument and to decide the case based on the evidence and the law. E.g., Cauthern, 967 S.W.2d at 737 (prosecutor's biblical reference should have triggered sua sponte curative action).

As to the prosecutor's intent with respect to the argument regarding the family's wishes, there is little basis to arrive at a conclusion. As to the biblical references, however, the State's contention that it was merely a response to defense counsel's argument is unconvincing. While we do not condone defense counsel's similarly improper comment, the prosecutor made his comments in the face of this Court's consistent admonitions that such remarks are inflammatory and highly improper. As discussed above, it is difficult not to conclude that such recurring misconduct is either intentional or alarmingly uninformed.

The remaining factors, however, weigh against a finding of reversible error. The improper remarks, although serious, were a relatively small portion of the prosecutor's argument, which otherwise focused on the facts and circumstances of the crime and a rebuttal of the defendant's mitigating proof. The jury was also instructed that arguments of counsel are not considered evidence. Finally, the cumulative effect of the improper conduct of the prosecutor was far outweighed by the strength of the evidence that supported the jury's finding that the aggravating circumstance outweighed proof of any mitigating factors.

The circumstances of the offense were shocking in their gruesomeness, brutality, and inhumanity. Medical evidence established the nature and severity of the injuries, bruises, cuts, abrasions, and wounds suffered by the victim. The victim was beaten and cut in the face, mouth, body, legs, and testicles. The evidence further indicated that an "X" had been carved into the victim's chest before his death from stab wounds. The victim was alive and conscious for much of the abuse inflicted upon him, and was conscious and alive for a period of time after being stabbed.

Middlebrooks by his own admission fully participated in the capture of Kerrick Majors and in the infliction of severe physical and mental pain to the victim by acts of unimaginable cruelty, despite the young victim's pleas for his life. Finally, after three to four hours of repeated sadistic acts, Middlebrooks stabbed the victim.

The evidence was overwhelming in support of the jury's findings that the State had proven this aggravating circumstance beyond a reasonable doubt and that this evidence was not outweighed by evidence of mitigating factors. Accordingly, we conclude that the prosecutor's misconduct did not prejudicially affect the jury's verdict.

In reaching this conclusion, our analysis has focused on whether the misconduct affected the verdict to the prejudice of this defendant. As in Cribbs, Cauthern, and similar cases, we have concluded that the evidence of the aggravating circumstance is so substantial that it justifies upholding the jury's verdict despite the misconduct. In view of the pattern of such prosecutorial misconduct in the trial court, as reflected on appeal in this Court and the Court of Criminal Appeals, we should warn offending prosecutors of the consequences. Those who interpret these cases as precedent for the view that improper closing argument and misconduct of this nature will be held harmless error in all cases do so at their own professional peril and at the risk that the misconduct, even if it does not prejudicially affect the verdict, may be deemed to be prejudicial to the judicial process as a whole and therefore require a new trial or resentencing. Tenn. R. App. P. 36(b).

We also observe that in addition to any action taken by the appellate courts, the professional misconduct of prosecutors is more efficiently and authoritatively addressed at the trial level where courts are in a better position to view the conduct, assess its impact, and choose the appropriate action to ensure a fair trial. For example, the trial judge can order the cessation of offending statements and can give curative jury instructions. In egregious cases, the trial judge may sua sponte stop a prosecutor's prejudicial argument.

In addition, the trial courts may consider direct sanctions to deter prosecutorial misconduct, including contempt citations, fines, and recommendations for disciplinary action to the Board of Professional Responsibility. We encourage the trial courts to consider these sanctions where the misconduct is flagrant. See United States v. Wilson, 149 F.3d 1298 (11th Cir. 1998).

**PROPORTIONALITY**

A comparative proportionality review must be undertaken in capital cases pursuant to Tenn. Code Ann. § 39-13-206(c)(1)(D) (1997). In conducting a comparative proportionality review, we begin with the presumption that the sentence of death is proportionate to the crime of first degree murder. State v. Hall, 958 S.W.2d 679, 699 (Tenn. 1997). The analysis compares the nature of the crime and defendant to the crimes and defendants involved in other cases in which the death penalty has been sought. This analysis seeks to identify aberrant, arbitrary, or capricious sentences by determining whether the death penalty in a given case is "disproportionate to the punishment imposed on others convicted of the same crime." State v. Bland, 958 S.W.2d 651, 662 (Tenn. 1997) (quoting, Pulley v. Harris, 465 U.S. 37, 42-43, 104 S. Ct. 871, 875, 79 L. Ed. 2d 29 (1984)).[10]

In comparing similar cases, we consider many factors, including (1) the means of death; (2) the manner of death; (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on nondecedent victims. Bland, 958 S.W.2d at 667. In comparing similar defendants, we consider factors such as: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental, emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation. Id.

---

[10] The Court of Criminal Appeals' decision was released prior to our decision in Bland. A remand is unnecessary, however, since the proportionality review of the record and other cases is de novo.

Without once again reciting the gruesome facts in full detail, the record reveals that Middlebrooks participated in the brutal torture of the victim for approximately four hours before finally stabbing him. The victim was mocked, urinated upon, severely beaten, cut, raped with a stick, and his genitals were beaten. The victim was alive and conscious throughout this torture and kept pleading that he just wanted to go to school and get an education.

The evidence suggests several possible motives. Middlebrooks' confession indicated that he stabbed Majors to prove that he was "cooler" than Brewington. Middlebrooks' confession also suggested that the torture and killing were in retaliation against the victim for knocking over an item on Middlebrooks' and his co-defendants' flea market table. Middlebrooks also stated he stabbed Majors to end the torture and put Majors out of his misery. The evidence also strongly indicates that the torture and killing were racially motivated. However, there is not one shred of evidence to suggest that Middlebrooks was justified or that Majors did anything to provoke this attack in any way. Majors was a small fourteen-year-old boy who was unarmed and defenseless against his attackers.

Middlebrooks, a twenty-four-year-old white male, apparently suffered from mental problems. However, there is no evidence that Middlebrooks felt any remorse for the crimes. Although Middlebrooks claims his role in the murder was slight, the evidence shows that Middlebrooks helped drag this child into the woods and participated in acts of torture inflicted on a helpless victim. Moreover, Middlebrooks, while giving conflicting statements, admitted stabbing the victim at least once. There is no evidence that Middlebrooks assisted or cooperated with authorities; to the contrary, he initially resisted arrest and then provided a confession that attempted to minimize his role in the offense. Despite the introduction of mitigating evidence in the sentencing phase, there was little to show a strong potential for rehabilitation.

Our review reveals numerous cases and defendants similar to this one in which we concluded that the death penalty was neither arbitrary nor disproportionate. In Hall, 958 S.W.2d 679, the defendant killed the victim with a gas bomb that inflicted third degree burns to more than ninety percent of the victim's body. Like Middlebrooks, Hall was twenty-four years old at the time of the murder. Like Middlebrooks, Hall was diagnosed as having a borderline personality disorder. One of the aggravating circumstances found by the jury to support the sentence of death was the present form of (i)(5)-- that "[t]he murder was especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5) (1997 & Supp. 1998). Like the present case, the victim in Hall was alive and conscious for much of the torture.

In State v. Hodges, 944 S.W.2d 346 (Tenn. 1997), the defendant strangled the victim who had been bound hand and foot and rendered helpless. Hodges was twenty-four when he committed this crime. Hodges' victim was alive, conscious, helpless, and pleading for mercy as the defendant strangled him. Hodges' mitigating evidence, similar to Middlebrooks', consisted of proof that he had been sexually abused as a child and that he suffered from an anti-social personality disorder. Despite this mitigating evidence, the jury sentenced Hodges to death based in part upon the finding that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5).

In Blanton, 975 S.W.2d 269, the twenty-nine-year-old defendant, along with other co-defendants, escaped from prison and killed an elderly couple. The evidence indicated that the defendant twice shot one victim, and he not only shot but stabbed the other victim a total of thirteen times as she was struggling to get

away. The evidence indicated that she lived for as long as fifteen minutes following the infliction of her wounds. Like Middlebrooks' victim, Blanton's victim suffered physically and psychologically before dying. Further, like Middlebrooks' killing of Majors, Blanton's attack upon his victim was unprovoked. In mitigation, Blanton submitted proof of his low intelligence, his impoverished childhood, and the troubled relationships within his family. He had also, like Middlebrooks, argued that the evidence implicated others for the killing. Blanton's jury returned a sentence of death based in part upon the finding of the (i)(5) aggravating circumstance.

In State v. Teel, 793 S.W.2d 236 (Tenn. 1990), the twenty-year-old defendant lured a fourteen-year-old girl into the woods where he raped and killed her. Teel was younger than Middlebrooks, and his victim was exactly the same age and of similar vulnerability as Middlebrooks' victim. In mitigation, Teel submitted proof that he had a low level of education, did not know his father, and had lost his mother when he was fourteen. Teel's jury returned a sentence of death based in part upon the finding that the evidence established the (i)(5) aggravating circumstance.

In State v. Alley, 776 S.W.2d 506 (Tenn. 1989), the defendant, almost thirty years old, abducted the nineteen-year-old victim and raped her by pushing a tree limb into her vagina to a depth of twenty inches. The victim suffered severe internal injuries, hemorrhaging, and multiple injuries, bruises, and abrasions to her entire body. Alley submitted substantial evidence that he had a borderline personality disorder, if not a multiple personality disorder. Despite this evidence, the jury returned a death sentence based in part upon the finding that the murder was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," the sole factor upon which the jury based Middlebrooks' death sentence.

In State v. Pike, 978 S.W.2d 904 (Tenn. 1998), the eighteen-year-old defendant lured the nineteen-year-old victim into the woods where for approximately

an hour, the defendant beat the victim and sliced her body so many times that the medical examiner could not even catalogue the multiplicity of wounds. The defendant finally beat the victim to death with a chunk of asphalt. As in this case, the victim was alive, conscious, and pleading for her life throughout the torture. Also like this case, evidence indicated that the victim's cries for mercy only irritated and incited the defendant. Pike submitted proof of her troubled childhood, yet, like Middlebrooks, Pike showed no remorse for her actions. The jury returned a death sentence based in part upon the finding that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death." Tenn. Code Ann. § 39-13-204(i)(5).

In Cauthern, 967 S.W.2d 726, the nineteen-year-old defendant, along with his co-defendant, broke into a married couple's home where he raped the wife and strangled both the husband and the wife. The evidence indicated that both could have lived for as long as three to six minutes from the time the blood supply was cut off, but that they could have been unconscious in approximately thirty seconds. Similar to Middlebrooks' mitigating evidence, Cauthern submitted proof of his troubled childhood, that he did not know his father and that he only had seen his mother three times since birth. Unlike Middlebrooks, Cauthern also submitted the favorable evidence of his attempts at rehabilitation, such as completing the graduate equivalency exam and a paralegal course, evidence of his good behavior, and evidence of his ability to get along with others. Cauthern's jury nonetheless returned a death sentence based solely on the finding that the evidence established the (i)(5) aggravating circumstance.

In State v. Caughron, 855 S.W.2d 526 (Tenn. 1993), the twenty-seven-year-old defendant and his girlfriend broke into the victim's home, beat her, raped her, tied her to the bed, strangled her, and drank her blood from shot glasses the defendant had brought with him. Caughron's victim suffered from multiple injuries

and begged for her life. In mitigation, Caughron submitted proof that he had a low level of intelligence and an abusive and unstable childhood. Like Middlebrooks' jury, Caughron's jury returned a death sentence based solely upon the finding that the murder was "especially heinous, atrocious, or cruel in that involved torture or depravity of mind."

In State v. O'Guinn, 709 S.W.2d 561 (Tenn. 1986), the defendant raped and murdered the seventeen-year-old victim. The evidence indicated that O'Guinn's victim had suffered a severe and brutal beating and had been raped with a hard, wooden or metal object before she was strangled to death. In mitigation, O'Guinn submitted proof of his strained relationship with his father. The jury returned a death sentence based solely on the finding that the murder was "especially heinous, atrocious, or cruel in that involved torture or depravity of mind." We affirmed.

In State v. Bush, 942 S.W.2d 489 (Tenn. 1997), the defendant stabbed the elderly victim, the best friend of his grandmother, forty-three times. The evidence indicated that the victim could have been rendered unconscious in either three to four minutes or twenty to thirty minutes, depending upon the order in which the wounds were inflicted. Bush submitted proof of his physically abusive childhood and history of mental problems, such as a borderline personality disorder and possible schizophrenia. The jury returned a death sentence based in part upon the finding that the evidence established the (i)(5) aggravating circumstance.

In Nesbit, 978 S.W.2d 872, the nineteen-year-old defendant tortured the twenty-year-old victim for at least six hours before shooting her once in the head. The victim sustained burns to her body from six hours to minutes before her death. She had also been struck on the bottom of her feet with a long, hard, thin object such as a rod or coat hanger. Nesbit presented proof of his good behavior in jail and testimony from his family describing him as honest, sincere, and responsible.

Unlike Middlebrooks, Nesbit testified to express his remorse for what had happened. Also unlike Middlebrooks, Nesbit cooperated with police after his apprehension. Like Middlebrooks' jury, Nesbit's jury returned a death sentence based solely on the finding that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."

In Bland, 958 S.W.2d 651, the nineteen-year-old defendant, without any provocation, chased and twice shot an unresisting victim and then shot the victim several more times as the victim sought refuge under a truck. The evidence indicated that the victim could have lived and suffered pain from two to fifteen minutes and could have been conscious up to four or five minutes. In mitigation, Bland presented his own testimony as well as his family's testimony that he had never known his father and had been raised by his mother and grandmother. Bland further testified that he had a low level of education. Bland's jury sentenced him to death based upon the sole finding that the murder was "especially heinous, atrocious, or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death."

In State v. McNish, 727 S.W.2d 490 (Tenn. 1987), the twenty-nine-year-old defendant bludgeoned the helpless seventy-year-old victim in her home with a glass vase. The victim was found alive and partially conscious immediately following the beating, though she died a short time later. In mitigation, McNish relied upon his own testimony as well as that of his parents, relatives, and friends. McNish also relied upon the absence of any prior criminal record and, like Middlebrooks, the evidence of his extreme mental or emotional disturbance. The jury returned a death sentence based upon the sole finding that the murder had been "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind."

Though no two cases are identical, the offenses and the defendants in the above cases bear many similarities with the present case. In all of the cases, the murder was inflicted upon a helpless and innocent victim without any explanation or provocation. In all of the cases, the victims were alive and conscious while suffering severe mental or physical pain. In several of the cases, the victims suffered severe and brutal beatings similar to the torture suffered by Kerrick Majors at the hands of Middlebrooks and Brewington. In all of the cases, the jury found that the evidence satisfied either the pre-1989 or the present version of the "heinous, atrocious, or cruel" aggravating circumstance. Additionally, in at least eight cases, the defendants were the exact same age or younger than Middlebrooks. In seven of the cases, the defendants offered mitigating proof of their mental problems and backgrounds that bore striking similarity to the evidence introduced by Middlebrooks.

Finally, several of the cases reject Middlebrooks' contention that the death penalty is arbitrary or disproportionate because a codefendant who was more involved in the killing received a lesser sentence. Bland, 958 S.W.2d at 665; Cauthern, 967 S.W.2d at 741; see also State v. Henley, 774 S.W.2d 908, 918 (Tenn. 1990), cert. denied, 497 U.S. 1031, 110 S. Ct. 3291, 111 L. Ed. 2d 800 (1989); State v. Poe, 755 S.W.2d 41, 49 (Tenn. 1988), cert. denied, 490 U.S. 1085, 109 S. Ct. 2111, 104 L. Ed. 2d 671 (1989). In Bland, we clearly stated that:

> [e]ven if a defendant receives a death sentence when the circumstances of the offense are similar to those of an offense for which a defendant has received a life sentence, the death sentence is not disproportionate where the Court can discern some basis for the lesser sentence. Moreover, where there is no discernible basis for the difference in sentencing, the death sentence is not necessarily disproportionate.

958 S.W.2d at 665 (citation omitted). Our task is "to assure that no aberrant death sentence is affirmed." Id. After reviewing the cases discussed herein, as well as numerous other first degree murder cases involving sentences of death and life

imprisonment, we conclude without any hesitation that the penalty imposed by the jury in this case is not aberrant and is neither excessive nor disproportionate to the penalty imposed for similar crimes.

## CONCLUSION

In accordance with the mandate of Tenn. Code Ann. § 39-13-206(c)(1) (1997) and the principles adopted in prior decisions of this Court, we have considered the entire record in this cause and find that the sentence of death was not imposed in any arbitrary fashion and that the evidence supports the jury's finding that the aggravating circumstance outweighed mitigating circumstances beyond a reasonable doubt. We have considered the defendant's assignments of error and have determined that none require reversal. With respect to issues not specifically addressed herein, we affirm the decision of the Court of Criminal Appeals, authored by Judge Curwood Witt and joined in by Judge Joe G. Riley and Special Judge Joe H. Walker, III. The relevant portions of that opinion are published hereafter as an appendix.

The defendant's sentence of death by electrocution is affirmed. The sentence shall be carried out as provided by law on the 11th day of November, 1999, unless otherwise ordered by this Court or other proper authorities. Costs of this appeal shall be assessed against the defendant, for which execution shall issue if necessary.

_____
_____RILEY ANDERSON, CHIEF JUSTICE

**Concur:**
Drowota, Birch, Holder and Barker, JJ.

-27-