# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### June 18, 2002 Session

## STATE OF TENNESSEE v. TIMOTHY WAYNE HOLLAND

### Direct Appeal from the Criminal Court for Robertson County
No. 00-0188     Michael R. Jones, Judge

---

### No. M2001-03129-CCA-R3-CD - Filed September 4, 2002

---

The defendant was convicted of facilitation of aggravated robbery and aggravated burglary for his participation with a codefendant in robbing a resident of a Springfield motel and burglarizing his room. The trial court sentenced him as a Range I, standard offender to an effective sentence of six years. Following the denial of his motion for a new trial, he filed a timely appeal to this court, raising the following issues: (1) whether the trial court properly denied his motion for a new trial based on his claim of an improper closing by the State; and (2) whether the trial court properly denied his request for a jury instruction on accessory after the fact. Based on our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and ROBERT W. WEDEMEYER, JJ., joined.

Lee Borthick, Springfield, Tennessee (on appeal); Roger Eric Nell, District Public Defender; and Charles S. Bloodworth, Assistant Public Defender (at trial), for the appellant, Timothy Wayne Holland.

Paul G. Summers, Attorney General & Reporter; Helena Walton Yarbrough, Assistant Attorney General; John Wesley Carney, Jr., District Attorney General; and Dent Morriss, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

The defendant, Timothy Wayne Holland, was charged by a Robertson County Grand Jury in a five-count indictment with aggravated robbery, a Class B felony; aggravated burglary, a Class C felony; theft of property over $1000, a Class D felony; evading arrest, a Class A misdemeanor; and assault, a Class A misdemeanor. The State subsequently dismissed the latter three counts of the

indictment, electing at the defendant's November 6-7, 2001, trial to proceed solely on the counts of aggravated robbery and aggravated burglary, charges stemming from an incident that occurred in a Springfield motel room on the afternoon of December 20, 1999.

The State's first witness was the victim, Jimmy Lee Wright, who testified that he was temporarily living in a room at the Royal Inn in Springfield in December 1999, having just moved back to the area from out-of-state. Although the motel was rundown, it was cheap, which enabled him to save the money he made as a painting contractor to apply toward getting a permanent residence. On December 20, 1999, he came home from work at approximately 4:00 p.m. to find a note on his door addressed to "Melissa." Knowing no one by that name, he took the note down, went into his room, and took a shower. Soon thereafter, he heard a knock at his door. After throwing a pillow over some cash he had lying on the bed, he opened the door to find two young African-American men who said they were looking for Melissa. He told the men he did not know any Melissa, and shut the door. The men immediately knocked again. When he opened the door the second time, one of the men pressed a gun against his head, and both men pushed him against a wall and entered the room, cursing and demanding his money. Inside the room, the men made him open his mouth, and inserted the gun.

The victim positively identified the defendant as the man who entered his room immediately behind the gunman. Although the gunman did most of the talking, the defendant also "talked some," saying, "Where's the money and you won't get hurt." When he pointed to the bed, the defendant went over, moved the pillow, saw the money, and picked it up. The victim said he had about $900 in cash on his bed: $400 in a money clip and a little over $500 in a pay envelope he had just received from his job. In addition, he had six $100 bills hidden inside the nightstand beside his bed, along with a bowl full of loose change. After the defendant took the money that was on the bed, the gunman ordered him to go into the bathroom and lie down in the bathtub. From there, he was able to hear the men rummaging through his belongings in the bedroom.

The victim testified that the two men came into the bathroom about three different times during the ten to fifteen minutes they spent in his room. The first time they came into the bathroom, the gunman accused him of lying to them. Calling him a "no good MF," the men told the victim that they were going to put "a cap" in his "ass," threatening to kill him if he did not tell them where all his money was. Both men talked at once, with some of the threats coming from the gunman and some from the defendant. Next, the gunman came back into the bathroom with some rubbing alcohol, holding a cigarette lighter and "laughing real crazy." The defendant, who was with him, was also laughing. The men first poured the alcohol all over him and then poured it all over the room, saying, "[W]e going to torch you you no good white piece of trash." As the victim prayed in the bathroom, he heard the men talking in his room. It then got quiet, and the victim realized they had left. Before they left, however, they told him that they knew where he worked, knew his car, and would return the coming weekend, after he got paid, to get the rest of his money. Regarding these threats, the victim testified that the defendant was "right in the middle of it just as deep as the other guy."

The victim estimated that the total amount of money taken from him was $1500, which did not include the value of the bowl of change taken from his nightstand. In addition to the cash, the men also took business cards he had used for a painting business he had operated in South Carolina, two watches, lottery tickets, his telephone, and a carton of cigarettes. After he was sure the men had gone, he made a "mad dash" to the motel office, where the manager telephoned the police. The following day, he saw some of his possessions in the office of Detective Terry Dorris of the Springfield Police Department. The victim identified a photograph of the recovered items, which, he said, showed his telephone, lottery tickets, and business cards. He said he had never seen either man before they appeared at his door. He had had no difficulty in picking both men's photographs out of separate photographic lineups shown to him by the police.

On cross-examination, the victim acknowledged that he had failed to mention, in the statement he gave police immediately after the crimes, that the defendant had talked or that he had been standing right behind the gunman inside the bathroom. He insisted, however, that the defendant was a full participant with the gunman in the crimes, testifying, "I just know that [the defendant] was there [in the bathroom] and he was right behind [the gunman]. And the exact words he said, I did not record every word he said by memory, but I know he was talking."

The State's next witness, Teresa Swinson, began her testimony by acknowledging that she was currently in prison on a parole violation. She testified that she was classified as a career criminal, and that her long history of "difficulties" with the law, including many prior convictions for forgery, stemmed from her abuse of drugs, primarily cocaine. However, she was currently drug-free and possessed a clear memory of the events of December 20, 1999. On that day she was in a room at the Royal Inn when three people, with whom she had had an earlier association, came into her room: a younger African-American man in his twenties; an older African-American man, whom she positively identified as the defendant; and a young, blonde-headed Caucasian woman who was "probably in her 20s also." The defendant told the woman to stay in Swinson's room, and left with the younger man. When the men returned to her room approximately ten or fifteen minutes later, they began "pulling stuff out of their pockets," including change, cash, pocketknives, cigarettes that were still in the carton, a cordless telephone, and some business cards.

Swinson identified Exhibit 1, previously identified by the victim as a photograph of his telephone, business cards, and lottery tickets, as items the men had brought into the room and which she had later turned over to Detective Richard Head of the Robertson County Sheriff's Department. When asked which man had the property, she hesitantly answered "the younger gentleman," but immediately added, "They were just pulling out stuff so fast, you know. Everything just really happened fast. And everything at that time was on the bed, you know. They were going through it." She saw the younger man lay a gun on the bed, but got only a brief look because both men were "very nervous . . . [t]rying to hurry up and rumble through stuff." After asking her to get rid of the cordless telephone and business cards, the men took the rest of the property, including the cash, and departed with the woman. Shortly after their departure, Detective Terry Dorris knocked on Swinson's door and asked to search her room, telling her that a robbery had just occurred and that the suspects had been seen entering her room. Although she allowed him inside to search, she did

not inform him of what had transpired in her room and did not turn over to him the items she had been given, opting instead to later telephone Detective Head, inform him of the situation, and turn the items over to him. Swinson explained that she did not want to be seen talking to a police officer at the motel, and that she knew and trusted Detective Head, having had dealings with him in the recent past.

Swinson claimed that she had had no knowledge of how the men obtained the property. She said that she had not been involved in the crimes, and that her parole violation had nothing to do with the instant case. She acknowledged on cross-examination that she had additional charges pending against her, but said she had not been promised anything by the State in exchange for her testimony in the case.

The State's last witness was Springfield Police Department Detective Terry Scott Dorris, who conducted the investigation of the case. He testified that he interviewed the victim at the motel immediately after the crimes, and later at the police department. At some point during his investigation, he showed the victim a series of photographs of different individuals. The victim first identified the gunman, Antonio Dowlen, and later, the defendant.[1] The victim expressed no hesitation or uncertainty when identifying the defendant. Detective Dorris confirmed that the property he had recovered and returned to the victim had been turned over to him by Detective Head. On cross-examination, he acknowledged that Antonio Dowlen fled to the Metropolitan Nashville area after the crimes, where he was arrested approximately six months later, while the defendant, who was arrested after fleeing from bicycle patrol officers who had spotted him on the street, remained in the Springfield vicinity. Dorris testified that he had not seen or talked to the defendant before his arrest.

The defendant began his defense proof by recalling Detective Dorris to the stand, whose memory defense counsel had refreshed during the break. Detective Dorris testified he now recalled that the defendant, accompanied by another individual he had been seeking in connection with a different robbery, had voluntarily come to his office to talk with him on January 4, 2000. He had taken the defendant's photograph at that time, and it was that photograph he had used in the January 6 photographic lineup in which the victim had identified the defendant.

The twenty-five-year-old defendant also elected to testify in his own defense. He said that he and Antonio Dowlen, who was about 20 or 21, had basically grown up together, having lived across the street from each other as children. On December 20, 1999, he was at the Royal Inn when he ran into Dowlen, who owed him $25. He asked Dowlen for his money. Dowlen responded by telling him that a man at the motel owed him some money, leading the defendant to believe that Dowlen knew the victim. The defendant said that he went with Dowlen to the victim's room, and described what next ensued:

---

[1] The victim identified Dowlen on December 22, 1999, and the defendant on January 6, 2000.

He knocked on the door. [The victim] opened the door. Antonio asked him where is the money and pulled out a gun. [The victim] said I don't have your money. We go into the room. Antonio still got the gun on [the victim] and he asked him about the money. Then he tell him to go to the bathroom. When they go to the bathroom I heard [the victim] holler.

The defendant testified that when he heard the victim yell, he left the room and headed toward the motel breezeway. Dowlen caught up with him about halfway between the breezeway and the other side of the motel, told him he had gotten $50, and gave him the $25 he was owed. At that point, he did not know that Dowlen had robbed the victim, believing instead the story that Dowlen told him, which was that the victim had owed Dowlen money for drugs. The defendant said that he did not have a gun, and did not threaten the victim or pour rubbing alcohol on him. The only money he took was the $25 Dowlen owed him.

The defendant claimed that the first time he learned of the robbery was about a week later, when he heard from Teresa Swinson that the police wanted to question him and Dowlen about a robbery. He said he also got a telephone call sometime around Christmas from a man named Antonio Jones, who informed him that Dowlen had robbed the victim. When he confronted Dowlen, Dowlen told him, "[D]on't worry about it. I'll take my charge." On January 4, he went to see Detective Dorris, who took his photograph. On January 10, six days after he had turned himself in, he was arrested. Approximately six months later, Dowlen was arrested. He did not know Dowlen's whereabouts during the months that transpired between his arrest and Dowlen's arrest.

On cross-examination, the defendant testified that he had just been released from prison after serving time for an aggravated assault conviction, and, therefore, would not have had anything to do with Dowlen had he known that Dowlen had a gun. He denied taking the victim's money off the bed, but admitted that he was in the victim's room with Dowlen. He did not know the victim and had no explanation for the victim's testimony against him, other than to speculate that the victim may have been coached to lie. He was unable to offer an explanation as to why someone would have coached the victim to lie.

In rebuttal, the State recalled the victim to the stand, who testified that he had not owed anyone any money for drugs. The victim also affirmed his earlier testimony that the defendant had participated with Dowlen in the crimes.

After deliberating, the jury convicted the defendant of aggravated burglary and facilitation of aggravated robbery, a lesser-included offense of aggravated robbery. In his motion for a new trial, the defendant asserted, *inter alia*, that the State made improper comments during closing argument and that the trial court erred by failing to provide jury instructions on accessory after the fact. The trial court overruled the motion, and the defendant filed a timely appeal to this court.

## ANALYSIS

### I. Closing Argument

As his first issue, the defendant contends that the State made improper comments regarding his credibility in its closing argument, thereby depriving him of a fair trial. He argues that the prosecutor's comment that he had an interest in the outcome of the case because he was the defendant, "crossed the line of proper argument and insinuated that any defendant's testimony should be per se less believable than that of any other witness." The State responds by arguing that the defendant has waived the issue by his failure to raise a timely objection at trial. The State further argues that, even if not waived, the prosecutor's comments were proper under the facts, law, and circumstances of this case. We agree with the State.

The manner and conduct of closing argument is left to the discretion of the trial court. State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994). Generally, both the State and the defense are afforded wide latitude in the scope of their closing argument to the jury. Id. The trial court, in turn, is afforded wide discretion in its determination of the propriety of closing argument, and its decision in these matters will not be reversed on appeal absent a showing of an abuse of discretion. See State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999); Coker v. State, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995); State v. Zirkle 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." Middlebrooks, 995 S.W.2d at 557. For a defendant to be granted a new trial based on the prosecutor's improper comments during closing, the complained-of conduct must have affected the verdict to the prejudice of the defendant. See Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965).

We first agree with the State that the defendant has waived this issue by his failure to raise a contemporaneous objection at trial. See Tenn. R. App. P. 36(a); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (stating that failure to object to prosecutor's alleged misconduct in closing argument waives any later complaint). However, even if not waived, we conclude that this issue is without merit. The defendant objects to the following statements made by the prosecutor in closing:

> In this case the Defendant has admitted that he was previously convicted of the crime of aggravated assault. Went to the penitentiary for it. He was very candid. Told you all about that. It would be wrong to say well, he did that crime so he must of done this one. And that is not the way that you use that evidence. That's impermissible. That's some kind of proof that would be like a character trait or something, and that's not the way you're permitted to consider it.
>
> The Court will tell you that the point is the person committed the crime of aggravated assault previously, prior to this case ever

-6-

happened, goes to the penitentiary for it, would that person lie? In other words, if a person commits a felony of aggravated assault, would that person come into a courtroom and have any compulsion about raising their hand and swearing that they would tell the truth and then lie about it? Particularly when it's his hide in this case that he's trying to safe [sic].

So, Ladies and Gentlemen, as the Defendant tells you all the reasons why you should maybe think about that this is just conduct that he just kind of sort of fell into, remember when [the victim] came back to the witness stand he told you no, [the defendant] didn't leave. [The defendant] did not leave. Who's the person with an interest in the outcome of this case?

Naturally, I would submit [the victim] would like justice done. I would submit that all participants in the trial process would like to see the process work, and would like to see us get to that word called truth. But there's one person here who has a reason, I submit to you, an interest, or bias for the outcome of the case, and a prior felony conviction, which is interesting to consider on the issue of his truth telling, his credibility.

The defendant concedes that the comments regarding his prior conviction were proper, but contends that the mention of his interest in the outcome of the case was an improper comment upon his credibility, based not on the evidence at trial, but instead on the mere fact of his status as a defendant. We respectfully disagree. The defendant cites State v. Beasley, 536 S.W.2d 328, 330 (Tenn. 1976), as support for his contention that the prosecutor's comment regarding his interest in the outcome of the case was improper. In Beasley, our supreme court held that closing argument should be supported by the evidence and the reasonable inferences to be drawn from it, and that a prosecutor's personal opinion as to the credibility of witnesses should not be interjected into argument. Id. In the case at bar, the prosecutor did not interject his personal opinion as to the defendant's credibility into closing argument, but instead merely asked that the jury consider, when evaluating the different accounts presented by the victim and the defendant, which party had an interest in the outcome of the case. There was nothing improper in this request. We agree with the State that the defendant made his credibility a key issue by taking the stand to deny that he participated in the crimes, and by suggesting that the victim was lying when he testified that the defendant was involved in the crimes. Since a resolution of conflicting testimony was key to the determination of the defendant's guilt, it was permissible for the prosecutor to argue that the jury consider the bias of the defendant versus the bias of the victim when evaluating the credibility of each witness's testimony. We, therefore, conclude that the trial court did not err in overruling the defendant's motion for a new trial based on the State's allegedly improper closing argument.

## II. Instruction on Accessory After the Fact

The defendant next contends that the trial court erred by failing to instruct the jury on accessory after the fact as a lesser-included offense to the crimes, arguing that there was sufficient evidence at trial to warrant an instruction on the offense. The State contends that the trial court properly denied the defendant's request for an instruction on accessory after the fact because it is a separate and distinct offense, rather than a lesser-included offense of the crimes with which the defendant was charged. The State points out that the defendant was not indicted with accessory after the fact, and asserts that there was no evidence to charge the defendant with the offense. We agree with the State.

Accessory after the fact is defined as follows:

> (a) A person is an accessory after the fact who, after the commission of a felony, with knowledge or reasonable ground to believe that the offender has committed the felony, and with the intent to hinder the arrest, trial, conviction or punishment of the offender:
>    (1) Harbors or conceals the offender;
>    (2) Provides or aids in providing the offender with any means of avoiding arrest, trial, conviction or punishment; or
>    (3) Warns the offender of impending apprehension or discovery.
>
>    . . . .
>
>    (c) Accessory after the fact is a Class E felony.

Tenn. Code Ann. § 39-11-411 (1997).

The defendant asserts that accessory after the fact is a lesser-included offense, and argues that subsections (1) and (2) of the statute are applicable in his case based on the fact that there was no evidence that he revealed Dowlen's name to Detective Dorris when he spoke with him on January 4. This court has consistently held, however, that accessory after the fact is a separate and distinct offense, rather than a lesser-included offense of a felony committed by the perpetrator of a crime. See State v. Hodgkinson, 778 S.W.2d 54, 63 (Tenn. Crim. App. 1989) (stating that accessory after the fact "is a separate and distinct offense and is not a lesser included offense"); State v. Hoosier, 631 S.W.2d 474, 476 (Tenn. Crim. App. 1982) ("The offense of accessory after the fact is a separate and distinct crime from that of a principal."); State v. Reginald Merriweather, No. W2001-02206-CCA-RM-CD, 2002 Tenn. Crim. App. LEXIS 123, at *34-*35 (Tenn. Crim. App. Feb. 11, 2002) (holding that trial court did not err in failing to instruct jury on accessory after the fact because it is not a lesser-included offense of attempted second degree murder, aggravated assault, or especially aggravated robbery, and the defendant was not charged separately with the offense of accessory after the fact); State v. Joel M. Puentes, No. M2001-01115-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS

92, at *11-*12 (Tenn. Crim. App. Feb. 1, 2002) (concluding that a review of the issue under analysis dictated by State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999), does not change the traditional view that accessory after the fact is a separate and distinct offense from the substantive offense); State v. James E. (Junebug) Ligon, No. M1999-02461-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 29, at *19 (Tenn. Crim. App. Jan. 12, 2001), perm. to appeal granted and remanded on other grounds (Tenn. May 29, 2001) ("Accessory after the fact fails to meet the definition of a lesser-included offense of either aggravated burglary or theft according to the Burns analysis.").

Moreover, we agree with the State that there was no evidence to warrant that the defendant be charged with the offense of accessory after the fact. No proof was presented to show that the defendant harbored or concealed Dowlen, or provided or aided in providing him any means of avoiding arrest or detection. By the defendant's own testimony, he had no knowledge of Dowlen's whereabouts. He was also aware that the police already had Dowlen's name as a suspect, since Teresa Swinson had informed him that they were seeking both him and Dowlen for questioning about the crimes. We conclude, therefore, that the trial court did not err in refusing the defendant's request to have the jury instructed on accessory after the fact as a lesser-included offense.

## CONCLUSION

Having reviewed the entire record in this case, we conclude that the trial court did not err in overruling the defendant's motion for a new trial based on his claim of an improper closing argument by the State and the trial court's failure to instruct the jury on accessory after the fact. Accordingly, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE