IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 20, 2002 Session

## DONALD RAY MIDDLEBROOKS v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 87-F-1682      Walter C. Kurtz, Judge**

_____

**No. M2001-01865-CCA-R3-PD - Filed January 9, 2003**

_____

The petitioner has been sentenced to death and now appeals as of right the judgment of the Davidson County Criminal Court denying his petition for post-conviction relief. The petitioner argues: (1) the post-conviction court erred in denying his *ex parte* request for funds for expert services; (2) the post-conviction court erred in denying his request for a continuance; and (3) he did not receive effective assistance of counsel during his resentencing hearing. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which DAVID H. WELLES and ALAN E. GLENN, JJ., joined.

Hershell D. Koger, Pulaski, Tennessee (at hearing and on appeal), and John E. Herbison, Nashville, Tennessee (at hearing), for the appellant, Donald Ray Middlebrooks.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Jennifer L. Smith, Assistant Attorney General; Victor S. (Torry) Johnson, III, District Attorney General; and John C. Zimmerman and Roger D. Moore, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

The petitioner was convicted of the felony murder of fourteen-year-old Kerrick Majors and was sentenced to death. The Tennessee Supreme Court affirmed the conviction, but remanded the case for resentencing because one of the aggravating circumstances used to impose the death penalty, the felony murder aggravating circumstance, was unconstitutional as applied to the petitioner's conviction. *See* State v. Middlebrooks, 840 S.W.2d 317, 346 (Tenn. 1992), *cert. dismissed,* 510 U.S. 124, 114 S. Ct. 651, 126 L. Ed. 2d 555 (1993). At resentencing, the jury again imposed the death penalty and the Tennessee Supreme Court affirmed the sentence. *See* State v. Middlebrooks, 995 S.W.2d 550 (Tenn. 1999). The petitioner filed a timely petition for post-

conviction relief, alleging his counsel at resentencing was ineffective. Following a hearing, the Davidson County Criminal Court denied the petition. This appeal followed.

**BACKGROUND**

The following facts presented at the petitioner's resentencing hearing are set out in the opinion of the Tennessee Supreme Court which affirmed the petitioner's death sentence:

> On the day of the murder, April 26, 1987, Donald Ray Middlebrooks, a twenty-four-year-old white male, his wife, Tammy Middlebrooks, a seventeen-year-old white female, and their friend Roger Brewington, a sixteen-year-old white male, had set up a make-shift flea market in East Nashville. When Kerrick Majors, the fourteen-year-old black male victim, and four of his friends walked over and began looking at the items on the table, Tammy Middlebrooks yelled "Hey, ya'll niggers leave our stuff alone."

> Donald Middlebrooks and Brewington chased after Majors and the other boys. Shannon Stewart testified that as he fled from the scene, he saw Brewington grab Majors and drag him toward the table, where Middlebrooks struck Majors in the face and knocked him down. Stewart heard Middlebrooks order Majors to "shut up nigger." The boys who made it to safety told Majors' mother what had happened. Majors' mother called the police and also searched for her son. The next day Majors' naked body was found lying face up in a dry creek bed under a foam mattress in the woods near the area where Majors had been abducted.

> Bruises, scrapes, abrasions, and burns covered Major's body. A woven belt was strapped around his left wrist. A large laceration was sliced across his right wrist. Two large lacerations made by a sharp instrument formed an "X" across his chest. A bloody and swollen gash was above his left eye. His nose was bloody, red, badly burned, and had pieces of skin missing. His lips were swollen and lacerated, and the inside of his mouth was bloody and lacerated. His testicles were badly swollen, and his legs were covered in blood down to his feet. There was urine on different parts of his body and on a rag tied in a tight knot around his neck that had been used as a gag in his mouth. A bloody stick lay next to his head. Finally, there were two deep stab wounds in his chest a couple of inches apart.

> The autopsy indicated that the cause of death was a stab wound to the chest and that the murder weapon had been plunged to a depth of 3.3 inches. The "X" carved into Majors' chest was

inflicted before the stab wounds, and at least one of the stab wounds was made prior to his death. Majors was alive and conscious throughout the infliction of the injuries and wounds. Majors lived a minimum of five to six minutes and a maximum of thirty minutes from the time of the stab wounds. He also would have been conscious part of the time while bleeding to death after being stabbed.

Two days after the murder, Brewington voluntarily notified the police that Donald Middlebrooks and Tammy Middlebrooks were involved in the murder. He showed the officers a bloodstained knife with a brass knuckle handle that had been used on Majors. Brewington also told the officers where to find Middlebrooks and his wife.

After being arrested, Middlebrooks gave a video-taped confession to the police in which he admitted his own involvement but described Brewington as the leader. According to Middlebrooks, after dragging Majors into the woods, Brewington tied Majors' hands and then slapped him, beat him with brass knuckles, urinated in his mouth, and made him swallow. Middlebrooks said that Brewington also beat Majors' testicles, threatened to cut "it" open, beat his mouth and tongue with a stick, and stuck a stick in Majors' anus. Whenever Majors resisted or screamed, Brewington continued to beat and slap him. Brewington told Majors he was taking him "back to the days of Roots." Brewington "dropped" the knife repeatedly on top of Majors, gagged him, and slashed his wrist. Middlebrooks stated that Tammy Middlebrooks also slapped Majors and burned his nose with a cigarette lighter.

Middlebrooks said that Majors was crying and begging them to stop. When Majors pleaded that all he wanted to do was to "go to school and get an education," Brewington replied "F--- you, nigger." Middlebrooks also said that Majors' cries were getting on his nerves so he asked Brewington to stop. According to Middlebrooks, Brewington then kissed Majors on the forehead and told him that it was "the kiss of death."

In the video-taped confession, Middlebrooks admitted stabbing Majors once and striking him across his legs with a switch. Middlebrooks explained that both he and Brewington stabbed Majors once. In a prior statement, however, Middlebrooks claimed to have inflicted both stab wounds. He also claimed he did not stop the torture because he was afraid of Brewington and is "scared to fight."

-3-

At another point, Middlebrooks contended that he stabbed Majors to prove he was "cooler" than Brewington.

According to the State's proof, fourteen-year-old Majors was small for his age. He was described as a good student who loved school. He was not a violent person, nor did he carry a weapon. Since his murder, his mother's health has deteriorated. She has been on medication and will not leave the house except for doctor appointments. She has had a nervous breakdown, suffers from panic attacks, and has not been able to sleep at night since the murder. Majors' older brother blames himself for Majors' death and now suffers from mood swings.

Shannon Stewart testified that he had spoken with Middlebrooks the morning of the murder. Middlebrooks had told Stewart that he was a member of the KKK, that he "hated niggers," and that he punched a black man just for saying hello. Stewart also testified that he overheard Middlebrooks order Majors to "shut up nigger."

The defense introduced mitigation evidence as follows: Middlebrooks' cousins, James and Carol Sue Little, and his half-sister, Sharon Fuchs, testified about Middlebrooks' childhood. Middlebrooks grew up in Texas. His father died when he was four. His mother remarried and had another child, Ms. Fuchs, before she again divorced. Middlebrooks' mother either left the children at night with relatives or else would take them to bars with her.

According to the proof, Middlebrooks' mother would often bring men to the house, and the children sometimes heard or saw their mother having sex. Ms. Fuchs testified that sometimes these men would molest her while her mother watched. She further testified that she, Middlebrooks, and other children in the family were molested by different family members. For example, Middlebrooks was often left alone with a male relative who had sexually abused him, and Middlebrooks' mother would grab him between his legs and also watch him use the bathroom. According to Sharon Fuchs, the small town in which they grew up lacked counseling services or social service agencies where they could seek help for sexual abuse. According to her, no one in the family ever discussed or admitted the family's problems.

The proof further indicated that Middlebrooks was often angry and got into trouble. He was sent to a Methodist Home for Children in Waco for two years. Later, he was twice sent to prison.

Between prison stays, Middlebrooks started to have seizures. On one occasion he climbed a water tower and threatened to commit suicide. He was hospitalized more than once at a mental institution.

A psychologist, Dr. Jeffrey L. Smalldon, performed neuropsychological and psychological evaluations of Middlebrooks. From these evaluations, interviews, testing, and prior education and medical records, Smalldon concluded that Middlebrooks has a severe borderline personality disorder. Middlebrooks exhibited several characteristics of the disorder including inconsistent behavior, instability of mood, a marked identity disturbance, impulsive and reckless behavior, poor anger control, and recurring suicidal or self-destructive acts. Smalldon testified that the documents from other mental health professionals who have evaluated Middlebrooks indicate that he suffers from substance abuse, psychotic personality disorder, and schizophrenia. Middlebrooks also suffers a mild degree of organic brain impairment which causes him to be more impulsive and less able to delay his responses. Finally, Smalldon testified that Middlebrooks has also exhibited characteristics of adults who were sexually abused as children.

During cross-examination, Dr. Smalldon admitted that Middlebrooks confessed to a greater involvement in Majors' death than he had in the video-taped confession. For instance, Smalldon disclosed that Middlebrooks admitted to him that it was his idea to hold Majors for ransom, that he helped tie Majors up, and that he urinated on Majors. In an attempt to resolve the discrepancies between the video-taped confession to the police and the confession made to him in the interview, Smalldon explained that Middlebrooks is a chronic liar. Dr. Smalldon conceded that Middlebrooks had never expressed any remorse to him. Smalldon agreed that there were some indications in the medical records of Middlebrooks' malingering, but testified that these indications were not inconsistent with mental illness.

In rebuttal, the State introduced the testimony of two experts indicating that Middlebrooks was exaggerating his mental illness symptoms, that he was competent to stand trial, that he did not have a defense of insanity, and that he was not committable. One expert testified that he could not say whether Middlebrooks was mentally ill. The other expert testified that he made no finding of mental illness and did not consider a personality disorder to be a mental illness.

After considering the evidence, the jury concluded that the aggravating factor set forth in Tenn. Code Ann. § 39-2-203(i)(5), that

-5-

the murder was "especially heinous, atrocious, or cruel in that it involved torture or depravity of mind," outweighed the evidence of mitigating factors. Accordingly, the jury sentenced Middlebrooks to death for the murder of Kerrick Majors.

Middlebrooks, 995 S.W.2d at 553-56 (footnotes omitted).

## PROOF PRESENTED AT POST-CONVICTION HEARING

At the post-conviction hearing, attorney David Stebbins testified he initially worked on the petitioner's case while it was before the United States Supreme Court on appeal. When the United States Supreme Court dismissed the appeal, Stebbins and two of the attorneys who represented the petitioner during his initial trial, Richard McGee and Lionel Barrett, agreed to represent the petitioner at resentencing.

Stebbins stated he was primarily responsible for the investigation and presentation of mitigation evidence at resentencing. Stebbins said he met often with the petitioner, reviewed the records from the petitioner's first trial, collected records and investigated the petitioner's background in preparation for resentencing. Stebbins testified they hired a mitigation specialist to investigate the petitioner's background.

Stebbins said the defense team had two theories at resentencing: (1) the petitioner was the "lesser player" in committing the offense in comparison to co-defendant Roger Brewington; and (2) the petitioner had "a bizarre childhood with a history of mental illness." Stebbins testified the defense team reviewed the transcript of Roger Brewington's trial and other documents and interviewed people who knew Brewington. Stebbins stated the only proof presented at resentencing which supported the theory that Brewington was more active in the offense than the petitioner was the petitioner's statements, in which the petitioner indicated he was afraid of Brewington and participated because Brewington threatened him. Stebbins said the defense team decided to limit the amount of proof they presented regarding Brewington because they were concerned that if they "came after Brewington too hard," the state would present Brewington's testimony at the hearing. Stebbins testified they were aware Brewington had given a statement to the police in which he blamed the petitioner for the offense. In his statement, Brewington said the petitioner told the victim to remove his clothes, indicated they were going to have to kill the victim, and stabbed the victim twice.

Stebbins said he was aware Brewington was larger than the petitioner and appeared to be far older than his actual age of sixteen at the time of the offense. Stebbins testified he was aware of information contained in a psychological report on Brewington. The report indicated Brewington had poor impulse control; unsocialized, aggressive behavior; impoverished moral reasoning; and was extremely self-centered. Stebbins stated he was unsure whether he reviewed Brewington's presentence report but was generally familiar with information contained in the report. Stebbins testified he was not aware the state submitted in the presentence report that Brewington's sentence should be enhanced because he was "a leader in the commission of the offense." Stebbins stated he

-6-

had reviewed documents belonging to Brewington, which included racist writings and drawings and an oath to serve the devil. Stebbins stated he had not seen certain documents relating to Brewington's social history, including medical records, court documents concerning his legal custody, and certain psychological reports.

Stebbins testified that prior to the testimony of defense expert Dr. Jeffery Smalldon at resentencing, he was unaware of any evidence indicating the petitioner urinated on the victim. Stebbins said he recommended hiring Dr. Smalldon because Dr. Smalldon had testified in a number of capital sentencing hearings and had a reputation for being competent. Stebbins testified he spoke with Dr. Smalldon a number of times in preparation for the petitioner's resentencing hearing, and they had at least four or five lengthy discussions. Stebbins stated he and Dr. Smalldon had detailed discussions regarding what the petitioner told Dr. Smalldon about the offense, but that Dr. Smalldon never advised him of the petitioner's statement that he urinated on the victim. Stebbins testified that if he had known the petitioner made such a statement, it would have been a factor in deciding whether to present Dr. Smalldon's testimony; however, Stebbins could not say it would have changed their decision to proceed with Dr. Smalldon's testimony.

Stebbins said he was unaware of any discrepancy between Dr. Smalldon's handwritten notes and his typed summary of those notes prior to Dr. Smalldon's testimony. Stebbins said Dr. Smalldon's recitation of the petitioner's statements to him concerning the offense did not vary from the version of the events the petitioner had communicated to Stebbins.

Stebbins said the defense began its proof with testimony from the petitioner's relatives concerning his childhood and personal history. According to Stebbins, that testimony went well. Stebbins testified he and co-counsel McGee briefly discussed whether they would present Dr. Smalldon's testimony and made a joint decision to proceed with the psychologist's testimony. Stebbins opined Dr. Smalldon's testimony "probably put the jury to sleep" and was unsure whether it carried much weight. Stebbins further stated the expert's testimony introduced to the jury the petitioner's statement that he urinated on the victim, which was harmful.

Prior to the resentencing hearing, two assistant district attorneys traveled to Ohio to interview Dr. Smalldon. Their interview was taped. Stebbins stated he was aware of the interview, but did not attend. According to Stebbins, Dr. Smalldon later debriefed him regarding the interview. Stebbins sent a letter to co-counsel in which he discussed Dr. Smalldon's meeting with the prosecutors, advised them the interview was taped, asked if the defense team should obtain a copy of the tape, and indicated they should review Dr. Smalldon's notes regarding the state's interview for potential weaknesses in his testimony. Stebbins testified he did not receive a copy of the tape and was not aware the tape was transcribed. The transcript of the tape revealed that Dr. Smalldon told the prosecutors the petitioner said he and Brewington urinated on the victim.

Stebbins testified that, prior to resentencing, the state received a copy of Dr. Smalldon's handwritten notes taken during his meetings with the petitioner along with Dr. Smalldon's summary of the notes. Stebbins indicated he did not notice a reference in the notes to the petitioner's statement that he urinated on the victim.

-7-

Another member of the defense team, attorney Lionel Barrett, testified at the post-conviction hearing that he reviewed Brewington's criminal court file and discussed the case with Brewington's attorney. Barrett opined that the petitioner's proof at resentencing went well until Dr. Smalldon testified. According to Barrett, the prosecutor did an excellent job of portraying Dr. Smalldon as a "hired gun." Barrett also indicated Dr. Smalldon's testimony regarding the petitioner's statement that he urinated on the victim was harmful, but that it was the cumulative effect of Dr. Smalldon's testimony that was detrimental. Barrett opined that he and co-counsel McGee were deficient in not properly investigating Dr. Smalldon's qualifications.

Clinical psychologist Dr. Jay David Woodman testified as a defense expert at the petitioner's first trial but not at the resentencing hearing. He testified at the post-conviction hearing that he interviewed Roger Brewington and reviewed some of Brewington's medical records, psychological reports, presentence report, and other records. Dr. Woodman opined that Brewington would have been more dominant and more inclined to be a leader than the petitioner. Further, Dr. Woodman testified it was possible Brewington sat back and allowed the petitioner to torture and kill the victim, and that the petitioner could have committed the offense without the help or encouragement of Brewington.

Dr. Woodman stated that prior to resentencing, he was contacted by someone from the petitioner's defense team seeking to review his data, which he made available. Dr. Woodman also said that when he interviewed Brewington in preparation for the post-conviction hearing, Brewington indicated he was unwilling to cooperate until the petitioner admitted he stabbed the victim. According to Dr. Woodman, Brewington stated the petitioner stabbed the victim, and the petitioner was the primary assailant who "did all of what was horrible."

## POST-CONVICTION COURT'S FINDINGS

Following the post-conviction hearing, the post-conviction court entered a detailed, thirty-page order in which it found, "Trial counsel should have done a much better job in showing the jury that [the petitioner] was entitled to the statutory mitigating circumstance set forth at T.C.A. § 39-13-204(j)(6) in that [the petitioner] acted 'under the substantial domination of another person,'" and, therefore, violated reasonable standards by failing to properly investigate co-defendant Brewington's background. The post-conviction court stated that documents produced at the post-conviction hearing depicted Brewington as "an aggressive and intelligent individual with a dominating personality;" counsel was aware of a psychological report on Brewington, but unaware of Brewington's presentence report in which the state submitted Brewington was a leader in the commission of the offense; counsel did not consider presenting expert testimony to compare the personalities of the petitioner and Brewington; and counsel should have known about additional information regarding Brewington's aggressive personality. According to the post-conviction court, trial counsel's decision to bypass a strong pursuit of the theory that Brewington was the dominant actor was not an informed decision.

Further, the lower court found that during the interview between the prosecutors and Dr. Smalldon, Dr. Smalldon revealed the petitioner's statement that he had urinated on the victim, that

neither the petitioner nor Dr. Smalldon had shared this information with trial counsel, and that trial counsel was surprised by this information during Dr. Smalldon's testimony. The post-conviction court also found attorney Stebbins spent considerable time interviewing Dr. Smalldon, reasonably believed he was thoroughly familiar with Dr. Smalldon's knowledge of the petitioner, and was not at fault for failing to know about the petitioner's statement. The lower court held trial counsel did not violate reasonable standards in presenting Dr. Smalldon's testimony, and that counsel's failure to review the tape of the state's interview with Dr. Smalldon and Dr. Smalldon's notes did not violate reasonable standards. The post-conviction court also found counsel was not at fault for the state's effective impeachment of Dr. Smalldon as a "hired gun" nor with inconsistencies between his written notes and the summary of those notes. Thus, the post-conviction court found no deficiency by trial counsel with regard to Dr. Smalldon.

Despite the post-conviction court's finding that trial counsel's performance was deficient in failing to properly investigate information that Brewington was the dominant offender, the lower court found the petitioner failed to prove there was a reasonable probability the outcome at trial would have been different but for counsel's deficiency. According to the post-conviction court, the "written word fails to convey the senselessness and horror of this crime" in which the twenty-four-year-old petitioner and two juveniles subjected the fourteen-year-old victim to torture over a period of several hours before killing him. The lower court stated the petitioner's confession described the "horrible details" of the crime. It found the petitioner's best mitigating evidence, his impoverished background and his suffering repeated childhood sexual abuse and neglect, were well presented to the jury through the testimony of family members. It further found that even if evidence of Brewington's dominance were added, the impact of this mitigation evidence would never overcome the torture of the victim, and the outcome at trial would have been no different.

## I. FUNDS FOR EXPERT SERVICES

In an *ex parte* proceeding approximately two months prior to the post-conviction relief hearing, the petitioner moved the post-conviction court for funds to hire a neurological radiologist to conduct tests on the petitioner. During the hearing, post-conviction counsel explained that the petitioner had been stabbed in the head with an ice pick years prior to the offense. According to post-conviction counsel, trial counsel was aware of the injury and Dr. Smalldon testified about it, but no tests were performed to confirm the petitioner suffered from organic brain damage. The neurological radiologist informed post-conviction counsel that an MRI could detect such brain damage and, if damage were detected, a PET scan would also be necessary. The post-conviction court denied the petitioner's motion because Dr. Smalldon testified at the resentencing hearing that the petitioner had organic brain damage, and the petitioner had not met his burden of showing the need for expert services. The petitioner contends the trial court abused its discretion in denying his request.

Our review of the record from the resentencing hearing reveals Dr. Smalldon indeed stated the petitioner suffered from organic brain damage and had a mild degree of functional brain impairment which affected his language skills.

A post-conviction court may in its discretion grant an indigent petitioner's *ex parte* request for funds for expert services to ensure the petitioner's constitutional rights are protected. Owens v. State, 908 S.W.2d 923, 928 (Tenn. 1995). Before the post-conviction court may authorize the funds, the petitioner must demonstrate the expert services are necessary to protect his constitutional rights by showing the services are required to establish a ground for post-conviction relief, and that he is unable to establish that ground by other available evidence. *Id.*

We conclude the post-conviction court did not abuse its discretion in denying the petitioner's motion for funds to hire a neurological radiologist. The record shows the proof presented by the petitioner at resentencing established the petitioner had organic brain damage. The petitioner failed to prove the expert's services were necessary for establishing a ground for post-conviction relief; more specifically, he failed to establish that services of the expert were required to prove trial counsel was ineffective for failing to seek funds to hire a neurological radiologist or to conduct an MRI and/or PET scan upon the petitioner prior to resentencing.

## II. CONTINUANCE

The petitioner moved the post-conviction court to continue the post-conviction hearing because post-conviction counsel needed additional time to complete its investigation into Roger Brewington's background. Prior to the start of the hearing, the post-conviction court stated it would reserve its ruling on the motion until after it heard the available proof. After hearing the proof, the court determined post-conviction counsel already had presented sufficient information regarding Brewington's relatively dominant personality and denied the petitioner's motion for a continuance. The petitioner argues the trial court erred in denying his request for a continuance to allow him additional time to develop proof.

A trial court is vested with the discretion to grant or deny a continuance. State v. Morgan, 825 S.W.2d 113, 117 (Tenn. Crim. App. 1991). This court will not disturb the denial of a continuance unless it appears that the lower court abused its discretion, and the movant was prejudiced as a result. State v. Cazes, 875 S.W.2d 253, 261 (Tenn. 1994), *cert. denied,* 513 U.S. 1086, 115 S. Ct. 743, 130 L. Ed. 2d 644 (1995). In the instant case, the post-conviction court did not abuse its discretion in denying the continuance. We further note the post-conviction court found trial counsel's performance deficient with regard to the Brewington issue. The petitioner suffered no prejudice. This issue is without merit.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

The final issue presented in this appeal is whether trial counsel was deficient at the petitioner's resentencing hearing and, if so, whether it affected the jury's verdict. The state maintains the post-conviction court erred in finding trial counsel was deficient for failing to further investigate and present proof regarding the relative dominance of Roger Brewington. The petitioner contends the lower court correctly found deficiency, but erred in concluding trial counsel's deficiency did not affect the outcome at resentencing. Further, the petitioner challenges the post-conviction court's determination that trial counsel's preparation for Dr. Smalldon's testimony did not violate reasonable standards.

## A. Standard of Review

For a petitioner to successfully overturn a jury's verdict based on ineffective assistance of counsel, the petitioner must first establish that the services rendered or the advice given was below "the range of competence demanded of attorneys in criminal cases." Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Second, the petitioner must show that the deficiencies "actually had an adverse effect on the defense." Strickland v. Washington, 466 U.S. 668, 693, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Should the petitioner fail to establish either factor, the petitioner is not entitled to relief. Our supreme court described the standard of review as follows:

> Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the defendant makes an insufficient showing of one component.

Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697, 104 S. Ct. at 2069). The petitioner is not entitled to the benefit of hindsight; the petitioner may not second-guess a reasonably based trial strategy; and the petitioner may not criticize a sound, but unsuccessful, tactical decision made after adequate preparation for the case. Adkins v. State, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see* Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Because the Eighth and Fourteenth Amendments to the United States Constitution require that a death sentence be based on a particularized consideration of each defendant, the courts are especially careful in protecting a defendant's right to counsel at a capital sentencing hearing. Nichols v. State, __ S.W.3d __, __, 2002 Tenn. LEXIS 419, at \*\*49-50 (Tenn. Oct. 7, 2002). Generally, trial counsel's failure to investigate and prepare for a capital sentencing hearing is below the range of competence required of criminal attorneys. Zagorski v. State, 983 S.W.2d 654, 657 (Tenn. 1998), *cert. denied,* 528 U.S. 829, 120 S. Ct. 83, 145 L. Ed. 2d 70 (1999).

The petitioner bears the burden of proving his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f). The findings of fact made by the post-conviction court are conclusive and will not be disturbed unless the evidence contained in the record preponderates against them. *See* Fields v. State, 40 S.W.3d 450, 457 (Tenn. 2001).

## B. Trial Counsel's Failure to Investigate Relative Dominance Theory

The post-conviction court determined trial counsel's performance in preparation for resentencing was deficient because counsel failed to adequately investigate facts supporting the theory that the petitioner's co-defendant, Roger Brewington, was the dominant actor in the commission of the murder. The state urges that the post-conviction court erred in making this determination, while the petitioner maintains the post-conviction court's determination of deficiency was proper.

Trial counsel must conduct appropriate factual investigations or make a reasonable decision that makes particular investigations unnecessary. Nichols, _ S.W.3d at _ , 2002 Tenn. LEXIS 419, at *17-18. In a capital trial, counsel's duty to investigate and prepare extends to the sentencing phase. Goad, 938 S.W.2d at 370. Informed choices and tactical decisions are entitled to deference from the courts; however, uninformed decisions made without adequate preparation are not entitled to deference. *Id.* at 369.

In the instant case, the proof at the post-conviction hearing established that one of the theories trial counsel pursued at resentencing was that Roger Brewington was the dominant actor in comparison to the petitioner. There was evidence that trial counsel investigated Brewington's background and obtained some information, including information concerning Brewington's psychological evaluation. However, the proof at the hearing also showed trial counsel was not aware of the state's position that Brewington's sentence should be enhanced because he was a leader in the commission of the offense. Trial counsel had not reviewed some documents which, according to psychologist Dr. Woodman, showed Brewington to have a more dominant personality than the petitioner. Attorney Stebbins testified the defense team decided not to aggressively pursue the theory that Brewington dominated the petitioner out of concern the state would present Brewington's testimony. There was proof at the hearing which clearly indicated Brewington's position was that the petitioner was primarily responsible for the torture and murder of the victim. We question the trial court's determination that counsel's tactical decision was not an informed one after an adequate investigation. However, because the petitioner has clearly failed to establish that additional proof of Brewington's more dominant personality would have affected the jury's verdict, it is not necessary for this court to address the deficiency prong. *See* Goad, 938 S.W.2d at 370.

When a petitioner claims ineffective assistance of counsel during the penalty phase of a capital case, he must show "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Nichols, _ S.W.3d at _, 2002 Tenn. LEXIS 419, at *50 (quoting Strickland, 466 U.S. at 695, 104 S. Ct. at 2069). In determining whether a defendant was prejudiced by counsel's failure to present sufficient mitigation evidence, the courts should consider several factors, including: (1) the nature and extent of the available mitigating evidence that was not presented; (2) whether substantially similar mitigating evidence was presented to the jury in either the guilt or penalty phase; and (3) whether there was such strong evidence of aggravating factors that the mitigating evidence would not have affected the jury's determination. *Id.* at _, 2002 Tenn. LEXIS 419, at *51; Goad, 938 S.W.2d at 371.

In the case *sub judice*, co-defendant Brewington was sixteen years old at the time of the murder. The resentencing jury heard the petitioner's statement to police in which he maintained he committed the offense out of fear of Brewington. Dr. Jeffery Smalldon also testified at resentencing that the petitioner indicated he was afraid of Brewington, who pressured him to stab the victim. However, this contention is questionable. In his statement to law enforcement, the petitioner said he stabbed the victim to prove to Brewington that he was "cooler" and to put the victim out of his misery. Middlebrooks, 995 S.W.2d at 554. Furthermore, in spite of the fact that Brewington may well have met the aggressive profile depicted by the petitioner, he was, nevertheless, only sixteen

years old at the time of the offense. The twenty-four-year-old petitioner was the only adult perpetrator.

Finally, the state's proof at resentencing established that the petitioner participated in subjecting the fourteen-year-old victim to hours of repeated horrific and sadistic acts, which culminated in the petitioner's stabbing and killing the victim. Based on our review of the record, we conclude, as did the post-conviction court, that no degree of finger-pointing to the sixteen-year-old co-defendant would have affected the jury's verdict in light of the hours of torture to the young victim which ended when the petitioner viciously stabbed the victim. The "heinous, atrocious, or cruel" aggravating circumstance was far too overwhelming to be offset by this mitigation theory. The petitioner has clearly failed to establish prejudice with regard to the relative dominance issue.

## C. Trial Counsel's Preparation for Testimony of Expert Witness

Although the post-conviction court found trial counsel was "surprised" by Dr. Smalldon's testimony regarding the petitioner's statement that he urinated on the victim, the court further found trial counsel had not violated reasonable standards in presenting Dr. Smalldon's testimony. It noted that Stebbins had spent considerable time in preparation for Dr. Smalldon's testimony and reasonably believed he was familiar with the psychologist's potential testimony. The petitioner contends trial counsel were ineffective for failing to more adequately prepare for Dr. Smalldon's testimony by seeking a copy of the taped interview between the prosecutors and/or more carefully reviewing Dr. Smalldon's handwritten notes.

The proof at the post-conviction hearing established trial counsel Stebbins spoke with Dr. Smalldon on numerous occasions regarding Dr. Smalldon's potential testimony. At least four or five of those discussions were lengthy, face-to-face meetings. They conversed in detail regarding the petitioner's version of the events. The proof showed that, despite these numerous, detailed interviews, Dr. Smalldon never revealed to Stebbins that the petitioner said he had urinated on the victim. Further, Stebbins indicated the petitioner did not tell him he had urinated on the victim, or that he made such a statement to Dr. Smalldon. Given trial counsel's extensive preparation for the testimony of Dr. Smalldon, we cannot conclude the post-conviction court erred in its determination that trial counsel's performance was within the range of competence demanded of criminal defense attorneys.

Furthermore, we conclude there is insufficient proof to establish this actually had a detrimental effect on the petitioner's defense at resentencing. Attorney Stebbins testified at the post-conviction hearing that even if he had known about the petitioner's statement to Dr. Smalldon, it would not have foreclosed the defense team's decision to present Dr. Smalldon's testimony. Attorney Barrett testified that while Dr. Smalldon's testimony about the petitioner's statement was harmful, it was the "cumulative effect" of his testimony, including the state's effective cross-examination of the psychologist as a "hired gun," which was detrimental. As noted by the post-conviction court, the depiction of an opposing party's expert as a "hired gun" is a common occurrence in trials, and trial counsel cannot be faulted for the prosecutor's vigorous cross-examination of the petitioner's expert witness. Further, Dr. Smalldon's testimony provided the jury

with significant mitigating evidence regarding the petitioner's background, mental health problems and brain impairment.

Common sense dictates there will be few capital cases in which the entirety of a defendant's expert's testimony paints a totally sympathetic picture of the defendant. Defense counsel is often faced with a situation, such as the instant case, in which the defense must present mitigation proof even though it is subject to attack. Finally, as we have previously stated, the state's proof at resentencing showed the petitioner committed dreadfully cruel and horrific acts of torture upon the victim prior to crudely terminating his life. It is not reasonably probable that the jury's verdict was affected by the alleged "surprise" testimony from Dr. Smalldon.

The petitioner has failed to establish either deficiency or prejudice with regard to this issue.

## IV. MISCELLANEOUS ISSUES

In an addendum to his brief, the petitioner listed numerous issues for our review in order to "preserve these issues" for further review. However, he failed to reference the record, cite any authority, or present any argument regarding these issues. Therefore, these issues are waived. *See* Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997); State v. Turner, 919 S.W.2d 346, 358 (Tenn. Crim. App. 1995); *see also* Tenn. R. App. P. 27(a)(7) and (g).

## CONCLUSION

We hold the post-conviction court did not err in denying the petitioner's request for funds for expert services or in denying the petitioner's request for a continuance. Further, we hold the post-conviction court did not err in finding the petitioner had failed to establish ineffective assistance of counsel. Accordingly, we affirm the judgment of the post-conviction court.

_____
JOE G. RILEY, JUDGE

-14-