IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 10, 2012

**STATE OF TENNESSEE v. RICKEY BENSON**

**Appeal from the Criminal Court for Shelby County**
**No. 11-01429     Carolyn Wade Blackett, Judge**

**No. W2011-01436-CCA-R3-CD  - Filed August 2, 2012**

The defendant, Rickey Benson, was convicted by a Shelby County Criminal Court jury of burglary of a building and theft over $1000, both Class D felonies, based on his theft of cigarettes from a Memphis Kroger.  He was subsequently sentenced by the trial court as a multiple offender to concurrent terms of seven years for each conviction.  He raises the following five issues on appeal:  (1) whether the evidence was sufficient to sustain the convictions; (2) whether there was a proper chain of custody and authentication for the admission of the store's surveillance videotape; (3) whether the trial court erred by admitting the store's inventory review documents; (4) whether his constitutional rights were violated by the prosecutor's allegedly improper closing comments; and (5) whether the trial court imposed an excessive sentence.  Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the Court, in which JOHN EVERETT WILLIAMS and CAMILLE R. MCMULLEN, JJ., joined.

Stephen Bush, District Public Defender; Phyllis Aluko (on appeal) and Thomas Pera (at trial), Assistant Public Defenders, for the appellant, Rickey Benson.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Lora Fowler, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

At approximately 11:30 p.m. on November 1, 2009, Patrick Stubblefield, the head of the produce department at a Memphis Lamar Avenue Kroger, was taking inventory after the store had closed when he heard a noise, looked up, and saw a man dressed in black crouched beside the tobacco products near the front of the store. The man would not identify himself and exited the store with a large plastic trash bag full of merchandise. The defendant was subsequently identified as a suspect and charged with one count of burglary of a building and one count of theft over $1000.

**Trial**

At trial, Stubblefield testified that he was working near the front of the store while the meat manager, who was the only other person who was supposed to be in the closed store, was taking inventory in the back part of the store. He said he heard a noise from the front, looked up, and spotted a man with a large black trash bag filled with product crouched beside the "tobacco corral" area near register one. Stubblefield stated that the man was dressed in baggy black shorts and a black t-shirt, was wearing some sort of black cloth on his head, and had tattoo markings beneath his eyes.

Stubblefield testified that he approached to within about twelve feet of the man and asked him to identify himself. The man, however, refused to give him a straight answer, instead telling him that he was picking up trash and that he was "his brother," as he gestured toward the back of the store. The man then made his way to the front doors of the store, carrying the garbage bag with him, and exited by turning the lock knob. After his departure, Stubblefield asked the meat manager if he had seen anyone in the store. The meat manager answered that he had not, and he and Stubblefield exited the store together to look for the security guard. Stubblefield also called the store's manager, who returned to the store to review the surveillance video with Stubblefield.

Stubblefield made a positive courtroom identification of the defendant as the man he had seen in the store. He testified that the area was well-lit and estimated that he spent approximately a minute and a half to three minutes in conversation with the defendant. He acknowledged that he viewed the surveillance tape within an hour of his encounter with the defendant, that the defendant was surrounded by three bailiffs when he identified him at the preliminary hearing, and that he did not mention anything about the defendant's tattoos at the preliminary hearing. He insisted, however, that his identification of the defendant was based on his personal encounter with him at the store and that he was certain of his identification.

Cecil Wages, Kroger's loss prevention officer, testified that the surveillance video system at the Lamar Avenue store had a watermark feature designed to prevent alteration or copying of the tapes. He said he had viewed the surveillance video, which contained a date

and time stamp, and that it depicted the Lamar Avenue Kroger.

Phillip McWilliams, senior co-manager of the Lamar Avenue Kroger, identified the surveillance tape of the incident, as well as a still photograph made from the tape and the store's shelf review documents of the missing cigarettes, which reflected that the store had an estimated "at cost" merchandise loss of $1,587.34 and an estimated retail merchandise loss of $2,378.71. McWilliams explained how they arrived at those figures, testifying that the store uses an ordering system called "Computer Assisted Ordering," which monitors each item of inventory from the moment it is brought into the store until it is removed from the inventory balance as the cashier scans it for sale to a customer. To determine the loss in this case, they performed a shelf review using a portable scanner. He described the process:

> This is a shelf review that we did, meaning that we had a drug D.M. manager log into that computer, our portable R.F. gun that we use in the store and she scanned to determine the los[s]es that we incurred to the best of our ability as far as knowing what was lost. If it was an empty hole and it showed that we had 50 packages of Newport cigarettes for instance and there's physically zero there now, we know we lost 50. And then it would be totaled up at the back end of the process.

On cross-examination, McWilliams testified that the shelf review was performed at 3:32 p.m. on November 2, 2009, which was eight hours after the store had opened. He acknowledged that the cigarette area of the store was not closed to the public during those hours.

Sergeant Gladys Burton of the Memphis Police Department's Burglary Bureau testified that she took the defendant into custody after viewing the store's surveillance video with Mr. McWilliams on November 2, 2009.

The defendant elected not to testify and rested his case without presenting any evidence.

## Sentencing Hearing

At the sentencing hearing, the defendant acknowledged that he had at least twenty misdemeanor convictions for theft of property, which, he said, were based on stealing small items such as candy bars, potato chips, and household goods. He also acknowledged that he had two pending assault cases and a pending charge of setting fire to personal property, which he had picked up while in jail. He stated that he received disability benefits for a mental illness, but he did not specify which mental illness he suffered. The presentence report, which

reflected the defendant's extensive criminal record as well as his self-report of having been diagnosed with bipolar disorder at the age of ten, was admitted as an exhibit to the hearing.

At the conclusion of the hearing, the trial court found one enhancement factor, the defendant's previous history of criminal convictions or criminal convictions. See Tenn. Code Ann. § 40-35-114(1) (2010). The court found no applicable mitigating factors. The court, therefore, sentenced the defendant as a Range II offender to concurrent terms of seven years for each offense.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence in support of his convictions. Specifically, he argues that the State failed to show beyond a reasonable doubt his identity as the perpetrator or that the value of the stolen cigarettes was $1000 or more.

When the sufficiency of the convicting evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in

this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)).

Finally, "[a] jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant argues that the evidence of his identity as the perpetrator consisted only of "shadowy images" on the surveillance tape and Stubblefield's in-court identifications, which were "prejudicially tainted by the unfairly suggestive manner" in which they took place. Stubblefield, however, was unequivocal that his identification of the defendant, both at the preliminary hearing and at trial, was based on his in-store confrontation with him rather than his viewing of the surveillance video or from seeing the defendant surrounded by bailiffs at the preliminary hearing. Furthermore, the surveillance tape, which contains a surprisingly good view of the defendant's facial features, supports Stubblefield's testimony that his encounter with the defendant occurred in a well-lit environment and under circumstances that afforded him a relatively lengthy and clear view of the defendant's face. Stubblefield also explained that he did not mention the defendant's tattoos at the preliminary hearing because no one asked him about them. We conclude, therefore, that the evidence in this case is sufficient to establish the defendant's identity as the perpetrator of the offenses.

The defendant next argues that the evidence was insufficient to establish the value of the stolen cigarettes. In support, he relies on the fact that the shelf inventory review was not performed until after the store, including the cigarette area, had been open to the public for approximately eight hours. However, according to McWilliams' testimony, any item purchased by a store customer would have been removed from the store's computer inventory at the time of purchase. Thus, the fact that customers had access to the cigarette area after the defendant's previous evening's theft, but before the shelf inventory was performed, should not have affected the store's calculated losses from the theft. McWilliams testified that, based on the packages of cigarettes that were included in the store's inventory but which were physically missing from the store, the store suffered an estimated at cost loss of $1,587.34 and an estimated retail loss of $2,378.71. This evidence was more than sufficient for the jury to find that the value of the stolen cigarettes was $1000 or more. We conclude, therefore, that the evidence is sufficient to sustain the defendant's convictions.

## II. Admission of Surveillance Tape

The defendant next contends that the trial court erred by admitting the store surveillance video because the State failed to show a proper chain of custody to establish its reliability.

Before tangible evidence can be admitted into evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. State v. Scott, 33 S.W.3d 746, 760 (Tenn. 2000). While every possibility of tampering does not have to be excluded, the circumstances must establish a reasonable assurance of the identity and integrity of the evidence. Id. The chain of custody requirement is "'to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" Id. (quoting State v. Braden, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). We will not reverse the trial court's decision in this regard absent a showing of a clearly mistaken exercise of its discretion. See State v. Beech, 744 S.W.2d 585, 587 (Tenn. Crim. App. 1987).

This issue arose because the prosecutor discovered that a copy of the surveillance tape that had been made for the police and kept in the property room was blank. Instead of the copy, therefore, the prosecutor sought to introduce the original tape. In a jury-out hearing held immediately before trial, Phillip McWilliams, the store's co-manager, identified the original store surveillance video from the time of the robbery and said that it had been kept in a desk drawer in the store manager's office, which was accessible only to himself, the other co-manager, and the manager. He testified that, to his knowledge, the tape had not been altered in any way. He acknowledged, however, that neither the office nor the desk drawer were kept locked at all times. At the conclusion of the hearing, the trial court denied the defendant's motion to exclude the tape, finding that McWilliams' testimony with respect to where and how the tape had been kept was sufficient for the videotape to be admitted into evidence.

We find no error in the trial court's ruling. Both McWilliams and the loss prevention officer, Cecil Wages, identified the evidence as the surveillance tape of the Lamar Avenue Kroger at the time of the theft. McWilliams further testified that the tape had been kept in a drawer in the desk of the store manager's office, where access was limited to only himself and two other store managers. Wages also testified that the surveillance tape's watermark feature prevented alteration or copying of the videotape. We note that this watermark is visible when the tape is fast forwarded or reversed and that it may, perhaps, explain why the copy that was attempted resulted in a blank videotape. Regardless, we conclude that the defendant is not entitled to relief on the basis of this issue.

### III. Admission of Inventory Review Documents

The defendant next contends that the trial court erred by admitting the inventory review

documents pertaining to the missing cigarettes. He argues that their probative value was substantially outweighed by their prejudicial effect because "[s]ome of the missing items that were attributed to the theft . . . could have been taken or sold during the hours that the store was reopened." The State argues that the defendant has waived consideration of this issue by his failure to include it in his motion for new trial and that plain error review is not warranted in the case. We agree with the State.

Although the defendant objected to the introduction of the documents at trial, he failed to include the issue in his motion for new trial. Issues relating to the admission or exclusion of evidence that are not raised in a motion for new trial are deemed waived on appeal. See Tenn. R. App. P. 3(e). Accordingly, we conclude that the defendant has waived consideration of this issue on appeal. We also decline to address the issue as plain error, as we conclude that no substantial rights of the defendant are affected by the alleged error.

### IV. Alleged Improper Closing Arguments

The defendant next contends that his constitutional rights were violated by the prosecutor's improper comments at closing, which, he asserts, were so egregious that they warrant reversal of his convictions. He complains of three portions of closing argument. The first occurred during the prosecutor's initial closing argument:

Now, [defense counsel] is a charming man. I'll give him that. But all the charm in the world can't negate the fact that [the defendant] was in that store. They're trying – the Defense is trying to throw you off what you can see with your own eyes. They don't want you to look. They don't want you to use your common sense. I guess they think you can't see, cause there is no doubt that that is [the defendant]. He knows it. The witnesses know it. [Defense counsel] knows it. But he wants to throw you off. Do not be deceived.

The second and third occurred during the prosecutor's rebuttal:

[Defense counsel] also harped on the fact about there were no fingerprints. [Defense counsel] isn't a fingerprint technician. He doesn't know anything about what surfaces are best for recovering fingerprints. So he doesn't know what he's talking about.

The third complained-of comments occurred as the prosecutor completed her argument to the jury:

[Defense counsel], he's like a salesman trying to sell you something that he

knows isn't good for you. Don't buy it. He knows. [The defendant] knows. That's why he's laughing. He knows that that's him on the video. And truth dictates and justice demands, ladies and gentlemen, that you find him guilty of both charges. Thank you.

The defendant argues that the prosecutor, in the above-quoted portions of closing, violated his right to a fair trial by impugning the veracity of both himself and his trial counsel. He further argues that the comments were so flagrantly improper that the trial court should have *sua sponte* intervened and issued curative instructions to the jury. The State responds by arguing that the defendant has waived the issue by his failure to object at trial or to raise the issue in his motion for new trial. The State further argues that the defendant cannot demonstrate plain error. We, again, agree with the State.

The failure to object to closing argument at trial waives our consideration of this issue on appeal. See Tenn. R. App. P. 36(a) (providing that relief is not required for a party who failed to take reasonably available action to prevent or nullify an error); State v. Stephenson, 195 S.W.3d 574, 601 (Tenn. 2006); State v. Thomas, 158 S.W.3d 361, 413 (Tenn. 2005); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (holding that the defendant's failure to object to the State's alleged misconduct during closing argument waives that issue). Thus, the defendant is not entitled to relief on appeal unless the remarks constitute "plain error." See Tenn. R. App. P. 36(b); State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000).

In determining whether an alleged trial error constitutes "plain error," we consider five factors: (1) the record must clearly establish what occurred at trial; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the defendant must have been adversely affected; (4) the defendant did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." See State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). Ultimately, the error must have "had an unfair prejudicial impact which undermined the fundamental fairness of the trial." Id. at 642.

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999). The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments

calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003).

The defendant is unable to show that a clear and unequivocal rule of law was breached, that a substantial right was affected, that he did not waive the issue for tactical reasons, or that consideration of the issue is necessary to do substantial justice. We, therefore, conclude that the defendant is not entitled to relief on the basis of this issue.

## V. Sentencing

Lastly, the defendant contends that the trial court imposed an excessive sentence by ignoring relevant mitigating factors, specifically, the fact that the defendant has suffered from bipolar disorder since the age of ten. The State argues that the trial court properly imposed sentences within the applicable range after considering the principles and guidelines of sentencing. We agree with the State.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record "with a presumption that the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d) (2010). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App.1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993), overruled on other grounds by State v. Hooper, 29 S.W.3d 1, 9 (Tenn. 2000).

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statistical information provided by the administrative office of the courts as to Tennessee sentencing practices for similar offenses, (h) any statements made by the accused in his own behalf, and (i) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210 (2010); State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App.

2001). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169.

In imposing a specific sentence within a range, a trial court "shall consider, but is not bound by" certain advisory sentencing guidelines, including that the "minimum sentence within the range of punishment is the sentence that should be imposed" and that "[t]he sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors[.]" Tenn. Code Ann. § 40-35-210(c)(1), (2). The weighing of the various mitigating and enhancement factors is "left to the trial court's sound discretion." State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008).

We find no error in the trial court's sentencing determinations. The only evidence of the defendant's mental illness consisted of the defendant's self-reporting to the probation officer who prepared his presentence report and his testimony at the sentencing hearing. There was no independent verification of that diagnosis or evidence of how it affected the defendant's behavior. Moreover, the defendant's presentence report reflects that the thirty-six-year-old defendant has a lengthy criminal history that includes, by our count, over fifty misdemeanor convictions for offenses such as theft, criminal trespassing, assault, vandalism, and indecent exposure as well as a felony conviction for aggravated robbery. In addition, the defendant, according to the prosecutor, also had a recent conviction for burglary of a building that was not reflected in the presentence report. Therefore, based on our review, we conclude that the trial court did not err in its application of enhancement or mitigating factors or in its imposition of the effective sentence of seven years in the Department of Correction.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE