IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 9, 2015

**STATE OF TENNESSEE v. JUSTIN TYLER**

**Appeal from the Criminal Court for Shelby County**
**No. 12-00600     Chris Craft, Judge**

**No. W2015-00161-CCA-R3-CD – Filed April 29, 2016**

The defendant, Justin Tyler, was convicted by a Shelby County Criminal Court jury of rape of a child, a Class A felony, and aggravated sexual battery, a Class B felony, and was sentenced to twenty-five years and ten years, respectively, to be served consecutively in the Tennessee Department of Correction. On appeal, the defendant argues that: (1) the trial court erred in admitting the video of the victim's forensic interview, (2) the prosecutor committed prosecutorial misconduct during closing argument, and (3) the cumulative effect of the errors warrants reversal. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT W. WEDEMEYER, J., joined.

Micah Gates, Memphis, Tennessee, and Joshua B. Dougan, Jackson, Tennessee (on appeal); Paul Guibao (at trial), Memphis, Tennessee, for the appellant, Justin Tyler.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Terre Fratesi and Cavett Ostner, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the defendant's molestation of his stepdaughter. At the defendant's trial, the victim's mother testified that the victim was nine years old at the time of the allegations in the case. The victim's mother had two other children in

addition to the victim, both boys younger than the victim, whose father was the defendant. The defendant was a presence in the victim's life from the time the victim was one year old. During the time period of the allegations, the victim, her two brothers, her mother, and the defendant lived together. Due to the victim's mother's and the defendant's work schedules, the defendant would sometimes be alone with all three children, usually on Sundays. The defendant was good with the children, and the victim's mother felt fine leaving the children with him. There was never an indication of any problems in the household.

The victim's mother testified that in June 2011, she took the victim to the hospital after the victim complained of a burning sensation while using the bathroom. The nurse who examined the victim told the victim's mother that the victim "had been messed with." A doctor then examined the victim. The doctor diagnosed the victim with a urinary tract infection. The victim's mother called the defendant and told him the doctor's findings and that the victim had said that the defendant had "mess[ed] with her." The defendant denied it.

The victim's mother testified that, when she got home, she confronted the defendant again, telling him that the victim had admitted to her and the doctor that he had abused her. After that, the defendant retrieved a gun, put it to his head, got down on his knees, and began saying he was sorry. However, he did not say what he was sorry for. He said that he was sick in the head and needed some help. The defendant finally handed his gun over to the victim's mother, and she put it inside her truck. The defendant apologized again. The victim's mother and her children got into her truck and waited until the defendant left. The victim's mother called the police the next day, explaining that she waited because the victim "was tired and she just wanted some rest." The victim went to the child advocacy center for a forensic interview.

The victim's mother admitted that the defendant took the victim to another doctor approximately a month earlier regarding the burning sensation and there was no mention of anyone "messing with" her. The victim's mother acknowledged that, when she first reported the information to the police, she told them that the victim had initially told the doctor that no one had "messed with" her. However, the victim's mother said that she told the victim "to be honest" and then the victim admitted that the defendant had been touching her.

The victim, who was twelve years old at the time of trial, testified that she remembered her mother taking her to the doctor after which the allegations in the case came out. She acknowledged that she initially told the doctor that nothing had happened to her but that was untrue. On the way home, she told her mother the truth – that the defendant had abused her. The victim explained that the reason she said that nothing had

2

happened to her when the doctor asked was because she was afraid that her mother would be mad.

The victim recalled that her mother confronted the defendant, and the defendant denied it, but the victim "told [her] mama he did do it." The defendant got on his knees and "kept saying he was sorry but he never said what he was sorry for." The defendant told the victim that he was sorry, but "[m]ost of the time he was looking at [the victim's mother]."

The victim testified that she went to the child advocacy center, where she talked to a woman about what had happened. She told the interviewer that the defendant had touched her on multiple occasions in his and her mother's bedroom. She recalled that he did so essentially every Sunday when they lived in the Stonehenge Apartments and while her mother was working at the Holiday Inn in West Memphis, Arkansas. The defendant performed oral sex on her, elaborating that she could feel his tongue moving on her vagina. She recalled that the defendant also touched her vagina with his penis while she was propped up on her hands and knees and the defendant on his knees behind her. However, the defendant never entered her vagina or anus with his penis, or asked her to put her mouth on his penis. She recalled that the last time the defendant touched her with either his mouth or penis was when they were living in the Stonehenge Apartments, where they lived for a couple of months. There were no more incidents after she told her mother.

Patricia Lewis, a forensic interviewer and forensic interview program manager at the Memphis Child Advocacy Center, recalled her interview of the victim on June 10, 2011. She said that the details provided by the victim were beyond what a child her age should have known. There was nothing during the interview that raised any concerns about the validity of the interview.

Sergeant Jay Dorning with the Memphis Police Department testified that the defendant gave a statement to police on July 13, 2011. In his statement, the defendant claimed that, before the allegations arose in this case, he had taken the victim to the doctor because of a complaint of pain in her genital area. The doctor prescribed an ointment to apply to her vagina, and the defendant applied the ointment to the victim's vagina twice. The defendant explained that he apologized to the victim in case he did anything to harm her. He denied touching the victim's private areas aside from the times he applied the ointment. Asked why he told the victim's mother to shoot him and handed her a gun, the defendant said, "I told her that if she think that I did that to my daughter then she can kill me." Asked how the victim got herpes, the defendant stated, "I kiss my daughter. I kiss my kids all the time."

Dr. Karen Lakin, a pediatrician, testified that the victim was examined on July 25, 2011 by a nurse practitioner whom Dr. Lakin supervised. The victim tested positive for Herpes Type 1, which can be transmitted by sexual or non-sexual skin contact. The doctor was not sure from what part of the body the culture was obtained but agreed it was likely from the genital region considering the victim was being examined because of complaints of pain in her vaginal area.[1]

Following the conclusion of the proof, the jury convicted the defendant as charged of rape of a child and aggravated sexual battery.

## ANALYSIS

### I. Video of Forensic Interview

The State filed a pretrial motion to determine the admissibility of the victim's forensic interview pursuant to Tennessee Code Annotated section 24-7-123. The trial court held a hearing on the motion, at which Vanessa Roberts, the team services director at the child advocacy center, testified that she was familiar with the law governing funding and appropriations for child advocacy centers. She was also familiar with the legal requirements for a child advocacy center to maintain its status and receive appropriations. Part of her job was to make sure the child advocacy center complied with those requirements. Ms. Roberts detailed the various services provided by the child advocacy center, which included conducting forensic interviews. She said that, however, her role did not entail assisting with forensic interviews or supervising the interviewers.

Patricia Lewis, forensic interview program director at the child advocacy center, testified that she has a degree in social work and that, prior to working at the child advocacy center, she was a case manager with the Department of Children's Services. She had undergone a criminal background check and had no criminal record. When she first became a forensic interviewer, she had to undergo forty hours of training and then her first interviews were done under supervision. She kept current on the yearly continuing education requirement for forensic interviewers of fifteen hours. Ms. Lewis stated that she had knowledge of child development, including important developmental milestones. She actively participated in local, regional, and statewide peer review in which interviewers would critique each other's interview techniques. At the time of trial, she had performed 6,677 forensic interviews of children in her career.

Ms. Lewis testified that she conducted a forensic interview of the victim on June 10, 2011. A law enforcement officer observed the interview from an observation room,

---

[1] The forensic interview of the victim shows that the victim told the interviewer that she was diagnosed with herpes in her genital region.

but she and the victim were the only ones present in the interview room. She affirmed that the DVD recording of the interview was complete and accurate. Ms. Lewis said that she was able to assess the victim's age and mental maturity, and the victim did not appear to have any reason to falsify or distort the events she described. Ms. Lewis was able to determine when in time the events the victim described occurred, as well as the nature and duration of the sexual abuse. The victim was able to describe the relationship between herself and the defendant and give graphic detail of sexual acts beyond what a child of her age would normally know. The victim was able to accurately identify and point to body parts using dolls and anatomical drawings, as well as use the dolls to demonstrate the sexual acts performed on her by the defendant.

Ms. Lewis testified that all of the equipment used during the interview was in working order and capable of making an accurate recording. She made an effort to not ask leading questions of the victim and followed an interview protocol known as RATAC, which stood for: rapport building, anatomical drawings, touch inquiry, abuse scenario, and closure. Ms. Lewis said that she had testified at other hearings like the one at which she was testifying and had been qualified in other hearings as an expert in forensic interviewing of children. She was familiar with the requirements in the Tennessee Code regarding the admissibility of forensic interviews. The victim was able to describe where she lived with the defendant at different locations. Ms. Lewis considered the victim's statements to be spontaneous and appropriately responsive to the questions she asked.

The victim testified that she had watched the video recording of her forensic interview and remembered the interview itself. She said that no one was in the interview room but her and Patricia Lewis of the child advocacy center. She affirmed that she told the truth in answering all of the questions. She recalled that everything she talked about and showed with dolls and drawings during the interview really happened, and no one told her what to say in the interview.

Following the testimony, the trial court ruled that the video of the forensic interview was admissible provided that the victim testified and was available for cross-examination.

The defendant asserts that the trial court erred in admitting the video recording of the victim's forensic interview pursuant to Tennessee Code Annotated section 24-7-123. He claims that: (1) the video did not have the particularized guarantees of trustworthiness required by the statute; (2) Patricia Lewis did not meet the statutory requirements to be a forensic interviewer; (3) the video does not accurately reflect what was said during the interview; and (4) the trial court failed to make specific findings of fact required by the statute.

Tennessee Code Annotated section 24-7-123 provides for the admissibility of the video recording of a forensic interview of a child under the age of thirteen during which the child described any act of sexual contact performed on or with the child if certain requirements are met. Tenn. Code Ann. § 24-7-123(a). The video recording "may" be admitted if:

(1) The child testifies, under oath, that the offered video recording is a true and correct recording of the events contained in the video recording and the child is available for cross examination;

(2) The video recording is shown to the reasonable satisfaction of the court, in a hearing conducted pre-trial, to possess particularized guarantees of trustworthiness. In determining whether a statement possesses particularized guarantees of trustworthiness, the court shall consider the following factors:

(A) The mental and physical age and maturity of the child;

(B) Any apparent motive the child may have to falsify or distort the event, including, but not limited to, bias or coercion;

(C) The timing of the child's statement;

(D) The nature and duration of the alleged abuse;

(E) Whether the child's young age makes it unlikely that the child fabricated a statement that represents a graphic, detailed account beyond the child's knowledge and experience;

(F) Whether the statement is spontaneous or directly responsive to questions;

(G) Whether the manner in which the interview was conducted was reliable, including, but not limited to, the absence of any leading questions;

(H) Whether extrinsic evidence exists to show the defendant's opportunity to commit the act complained of in the child's statement;

(I) The relationship of the child to the offender;

(J) Whether the equipment that was used to make the video recording was capable of making an accurate recording; and

(K) Any other factor deemed appropriate by the court;

(3) The interview was conducted by a forensic interviewer who met the following qualifications at the time the video recording was made, as determined by the court:

(A) Was employed by a child advocacy center that meets the requirements of § 9-4-213(a) or (b);

(B) Had graduated from an accredited college or university with a bachelor's degree in a field related to social service, education, criminal justice, nursing, psychology or other similar profession;

(C) Had experience equivalent to three (3) years of fulltime professional work in one (1) or a combination of the following areas:

(i) Child protective services;

(ii) Criminal justice;

(iii) Clinical evaluation;

(iv) Counseling; or

(v) Forensic interviewing or other comparable work with children;

(D) Had completed a minimum of forty (40) hours of forensic training in interviewing traumatized children and fifteen (15) hours of continuing education annually;

(E) Had completed a minimum of eight (8) hours of interviewing under the supervision of a qualified forensic interviewer of children;

(F) Had knowledge of child development through coursework, professional training or experience;

(G) Had no criminal history as determined through a criminal records background check; and

(H) Had actively participated in peer review;

(4) The recording is both visual and oral and is recorded on film or videotape or by other similar audio-visual means;

(5) The entire interview of the child was recorded on the video recording and the video recording is unaltered and accurately reflects the interview of the child; and

(6) Every voice heard on the video recording is properly identified as determined by the court.

Tenn. Code Ann. § 24-7-123(b).

The admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion. State v. Robinson, 146 S.W.3d 469, 490 (Tenn. 2004). See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court's exercise of discretion will only be reversed on appeal if the court "'applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" Robinson, 146 S.W.3d at 490 (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

The defendant first contests the admissibility of the interview based on an assertion that it did not have the particularized guarantees of trustworthiness required by the statute because the interviewer, Ms. Lewis, asked leading questions. In support of his claim, the defendant cites the following exchange, which he claims to be leading:

Q:    Do you know if [the defendant] ever told you about him doing this to somebody else?  That make sense?  Um, do you know if he

8

ever told . . . do you know if he ever did this to somebody else? Do you know of him doing it to somebody else?

> A: No ma'am.
>
> Q: He ever told you that he did it to somebody else?
>
> A: No ma'am.
>
> Q: Okay.
>
> A: He probably did, but he didn't tell me.

These questions were not leading and were framed in the only conceivable way to elicit the sought after information – whether the defendant had told the victim about abusing others. This issue is without merit.

The defendant also complains that Patricia Lewis did not meet the statutory requirements to be a forensic interviewer because she failed to complete fifteen hours of continuing education annually as required by the statute. He acknowledges that Ms. Lewis testified that she has kept up with her continuing education requirements but asserts that her "curriculum vitae tells a different story" – that she "failed to complete the required continuing education in 2001, 2002, 2005, and 2007." However, as a matter of common sense, it appears that Ms. Lewis had carryover hours from previous years to account for why it could look as if she did not earn any hours in those noted years. According to Ms. Lewis' curriculum vitae, from December 2000-December 2013, she logged a total of 425.5 hours at symposiums/conferences, in addition to 52.8 hours of culture and sensitivity trainings and 59.5 hours of webinar/workshop trainings. Had she logged no more than the minimum of fifteen hours annually, she would have logged a total of 195 hours during this same period. Ms. Lewis' curriculum vitae paints the picture of a professional who goes far above the minimum requirements imposed on her. Moreover, at no point during trial did the defendant raise any objection to Ms. Lewis' continuing education requirements, which would have given her the opportunity to explain any deficit in her satisfaction of the requirements. See Tenn. R. Evid. 103(a)(1) ("Error may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record."); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

The defendant further argues that the video does not accurately reflect what was said during the interview because "it is often difficult if not impossible to understand what [the victim] is saying on the video due to the low quality of the audio" and is therefore untrustworthy. However, both the trial court and defense counsel at trial did not seem to have this problem. In discussing the transcript of the video recording, the trial court characterized the transcript as an "extremely accurate" transcription of the video recording, with "a word missing" "[e]very now and then" but nothing "significant." Similarly, defense counsel agreed with the trial court that "[o]ne phrase I think slipped in after a spot but it was nothing of any worth." These would be strange characterizations of the transcript had the victim's voice not been heard on the recording. Moreover, the record is devoid of any objection by defense counsel to the victim's voice being inaudible on the recording.

The defendant lastly argues that the video should not have been admitted because the trial court failed to make specific findings of fact as required by the statute. Following the presentation of the proof, the trial court ruled that the video of the forensic interview was admissible provided that the victim testified and was available for cross-examination. The trial court did not make more specific findings of facts on the record as to the basis for its ruling, as directed by the statute. However, neither the statute nor the cases in which the statute has been discussed answer the question of what results when there is virtually perfect compliance with the statute, but the court fails to make complete findings of fact. As such, we determine that the result of the trial court's not making factual findings on the record is that our review is purely de novo, rather than abuse of discretion and, having conducted a de novo review, we conclude that the trial court properly admitted the video recording into evidence.

In any event, even if the trial court improperly admitted the video of the forensic interview, such error was harmless in light of the victim's testimony at trial and the other evidence against the defendant.

## II. Prosecutorial Misconduct

The defendant next argues that the prosecutor committed prosecutorial misconduct four separate times during closing argument. He asserts that the prosecutor improperly: (1) argued facts outside the record; (2) asked the jury to put itself in the victim's shoes; (3) told the jury that child rapists almost never get punished; and (4) told the jury four times to be passionate about its verdict.

Initially, we note that the defendant has waived this issue for failing to make a contemporaneous objection to any of the statements at trial. See State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (failure to object to prosecutor's alleged

misconduct during closing argument waives any later complaint). Moreover, although the motion for new trial is not in the record on appeal,[2] from the transcript of the motion for new trial hearing, it also appears that the defendant did not raise the issue of prosecutorial misconduct in his motion for new trial. Therefore, we will review the issue only for plain error.

In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "'necessary to do substantial justice.'" State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

The five generally recognized areas of prosecutorial misconduct occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. State v. Goltz, 111 S.W.3d 1, 6 (Tenn. Crim. App. 2003). Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). A party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999).

For a defendant to be entitled to a new trial on the basis of allegedly improper remarks during the closing argument, the comments must be shown to have prejudiced the case by affecting the jury's verdict. Middlebrooks, 995 S.W.2d at 559. In determining whether this occurred, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the

_____

[2] The defendant indicates in his brief that the trial court's file went missing at some point during the proceedings and that, although it was apparently recreated, the motion for new trial was lost during the process.

11

improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. Id. at 560.

In its closing argument, the prosecutor said that the defendant "would wait until [the victim's mother] was at work . . . [e]very Sunday" to abuse the victim. Later, the prosecutor said, "Can you imagine how [the victim] felt every Sunday?" The defendant claims that the prosecutor's argument suggested that the victim was molested every single Sunday of her entire life, which amounted to arguing facts outside the record. Along these lines, he asserts that the State also "went back on its word" that it would not seek to introduce or discuss any sexual acts that fell outside the indictment window of April 1, 2011 to June 8, 2011.

The proof at trial showed that the defendant molested the victim essentially every Sunday when they lived at the Stonehenge Apartments while her mother was at work at the Holiday Inn in West Memphis, Arkansas. There is no reason to surmise the jury would have taken the prosecutor to be arguing that the defendant molested the victim every Sunday of her entire life as opposed to what the proof showed. We simply cannot conclude this statement by the prosecutor breached a clear and unequivocal rule of law or adversely affected a substantial right of the defendant.

The defendant also challenges three other statements in the prosecutor's closing argument. He asserts that the prosecutor's argument, "Can you imagine how [the victim] felt every Sunday?" inflamed the passions of the jury and was an impermissible request for the jury to put itself in the victim's shoes. He asserts that the prosecutor made impermissible argument about the frequency and prosecution of child rape by stating, "[I]f it gets reported, chances are it will never see inside of a courtroom. You can't convince enough police and prosecutors to take these cases on. And then it's a really good chance if it ever makes inside the courtroom, one of you will say you won't believe her." He asserts that the prosecutor inflamed the passions of the jury by telling it to be proud of convicting the defendant, arguing in part, "[I]f you do believe [the victim], then when you come back in here with that file, be proud of it. Be proud to hold him accountable. Be proud to have that verdict read that says we don't buy it, [the defendant]."

After review, while we do not endorse these statements made by the prosecutor, we conclude that none of the statements adversely affected a substantial right of the defendant by having any effect on the verdict.

### III. Cumulative Error

The defendant lastly argues that the cumulative effect of the errors in the case warrants reversal, even if none of the errors do so individually. However, having found no errors, we respectfully disagree and conclude that the defendant is not entitled to relief on the basis of cumulative error.

## <u>CONCLUSION</u>

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE